UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JOHN L. LEGRAND,<br><br>           Plaintiff,<br><br>     vs.<br><br>DR. MARY CARPENTER, Medical Director, in her individual capacity; DAN SULLIVAN, Warden of Sioux Falls Prisons, in his individual capacity; DR. AARON HAYNES, in his individual and official capacity; KELLIE WASKO, Secretary of Corrections, in her official capacity; DR. MARK RECTOR, in his individual and official capacity; and AMBER PIRRAGLIA, in her official capacity,<br><br>           Defendants. | 4:22-CV-04168-CCT<br><br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE-LAW CLAIMS** |

Plaintiff, John L. LeGrand, who was an inmate at the South Dakota State Penitentiary (SDSP), filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Docket 1.

**PROCEDURAL BACKGOUND**

The Court screened LeGrand's complaint under 28 U.S.C. § 1915A, dismissing it in part and directing service upon defendants in part. Docket 8. LeGrand's Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Mary Carpenter in her individual and official capacity for injunctive relief, against former Warden Dan Sullivan in his individual capacity, and against Warden Teresa Bittinger in her official capacity for

injunctive relief survived screening. *Id.* at 12. LeGrand's state-law medical malpractice claim against Dr. Carpenter also survived § 1915A screening. *Id.* at 13. Because Dr. Carpenter is no longer the Medical Director of the Department of Corrections, her successor, Dr. Aaron Haynes, was substituted for Dr. Carpenter on the official capacity claims. *See* Docket 21 at 1 n.1. Bittinger is no longer the Warden at the SDSP, and Amber Pirraglia, the acting Warden at the SDSP, has been substituted for Bittinger on the official capacity claims. *See* Docket 125.

The deadline to move to join additional parties and to amend the pleadings was August 21, 2023. Docket 14 ¶ 1; Docket 20. Shortly before the expiration of the motion to amend deadline, LeGrand filed an amended pleading including supplemental claims and joining additional defendants. Docket 30. Defendants objected to LeGrand's amended pleading because he did not obtain leave of court in accordance with Federal Rule of Civil Procedure 15 before filing the amended pleading. Docket 35. The Court determined that LeGrand's Eighth Amendment claim for deliberate indifference to serious medical needs against Secretary of Corrections Kellie Wasko in her official capacity for injunctive relief; Eighth Amendment claim for deliberate indifference to serious medical needs against Dr. Mark Rector in his individual and official capacity for injunctive relief; Eighth Amendment claim for deliberate indifference to serious medical needs against Dr. Haynes in his individual capacity; and state-law medical malpractice claims against Dr. Rector and Dr. Haynes were not futile and could proceed. Docket 77 at 10–15,

21–22. Defendants move for summary judgment on all of LeGrand's claims. Dockets 55, 100.[1]

After the Court entered an order denying LeGrand's motions seeking to depose numerous inmates and experts, his motion for an ADA aid, and his motion to disqualify defendants' counsel, Docket 132, LeGrand filed a "Notice of Objection to the Court's January 23, 2025 Order on Plaintiff's Pending Motions." Docket 135 (capitalization in original omitted). He states that "these denials are in fact ripe for U.S. Supreme Court review under de novo." *Id.* at 4 (capitalization in original omitted). LeGrand served his Notice of Objection on the Clerk of the United States Supreme Court. *Id.* at 8. LeGrand also filed a "Notice of Appeal to the United States Supreme Court for Review De Novo for the District Court's Violation of her Oath of Office 28 U.S.C. § 453 Appeal from Courts [sic] Bad Faith Denial." Docket 136 (capitalization in original omitted). LeGrand served a copy of his notice of appeal on the United States Supreme Court Clerk. *Id.* at 3. Subsequently, LeGrand filed a notice of clarification asserting that his Notice of Appeal had been misconstrued and that he simply was providing notice of his intent to formally appeal the entirety of the case to the United States Supreme Court and that he does not intend to pursue an

---

[1] There are two motions for summary judgment because Dr. Carpenter, former Warden Sullivan, and Dr. Haynes moved for summary judgment before the Court ruled on defendants' objections to LeGrand's amended and supplemental pleading. *See* Docket 55; Docket 77 at 7–19; Docket 85.

interlocutory appeal. *See* Docket 140.[2] LeGrand did not serve his notice of clarification on the Clerk of the United States Supreme Court. *Id.* at 5.

Because LeGrand has filed a document entitled "Notice of Appeal to the United States Supreme Court," the Court must consider whether it retains jurisdiction to consider defendants' motions for summary judgment.

"As a general rule, an appeal to the Supreme Court is deemed taken when the notice of appeal is filed with the District Court Clerk. At that point, the Supreme Court takes jurisdiction over the matter." *Grier v. Reagan*, Civ. A. No. 86-0724, 1986 WL 3948, *2 (E.D. Pa. Apr. 1, 1986) (cleaned up). "However, when an appeal is invalid because the order being appealed was not final, the district court . . . may disregard the purported notice of appeal and proceed with the case, knowing that it has not been deprived of jurisdiction." *In re Fisette*, 695 F.3d 803, 807 (8th Cir. 2012) (cleaned up); *see also Ruby v. Sec'y of U.S. Navy*, 365 F.2d 385, 389 (9th Cir. 1966) ("Where the deficiency in a notice of appeal, by reason of untimeliness, lack of essential recitals, or reference to a non-appealable order, is clear to the district court, it may disregard the purported notice of appeal and proceed with the case, knowing that it has not been deprived of jurisdiction."). "To prevent parties from using frivolous appeals to delay or interrupt proceedings in the district court, that court does not normally lose jurisdiction to proceed with the case when one

---

[2] At the same time LeGrand filed the notice of clarification, Docket 140, he filed a motion for judgment on the pleadings and request for a trial date, Docket 138.

party appeals a non-appealable order." *Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1106 (8th Cir. 1999).

> Rule 18.1 of the Rules of the United States Supreme Court provides:
>
> When a direct appeal from a decision of a United States district court *is authorized by law*, the appeal is commenced by filing a notice of appeal with the clerk of the district court within the time provided by law after entry of the judgment sought to be reviewed. The time to file may not be extended. The notice of appeal shall specify the parties taking the appeal, designate the judgment, or part thereof, appealed from and the date of its entry, and *specify the statute or statutes under which the appeal is taken.* A copy of the notice of appeal shall be served on all parties to the proceeding as required by Rule 29, and proof of service shall be filed in the district court together with the notice of appeal.

U.S. Sup. Ct. R. 18.1 (emphasis added). Here, LeGrand's notice of appeal fails to comply with the requirements outlined in Rule 18.1. Specifically, LeGrand has not "specif[ied] the statute or statutes under which the appeal is taken." U.S. Sup. Ct. R. 18.1; *see also Demos v. U.S. Dist. Ct. of Cheyenne, Wyoming*, Case No. 19-cv-00003-ABJ, 2020 WL 13634850 (D. Wyo. Jan. 31, 2020) (dismissing petitioner's notice of direct appeal to the Supreme Court for failure to comply with Rule 18.1); *Grier*, 1986 WL 3948, at *2 (holding that plaintiff's notice of appeal to the Supreme Court was insufficient to divest the court of its jurisdiction).

While LeGrand asserts that the Court's order violated his constitutional rights, this claim appears to be an attempt to expand the Supreme Court's jurisdiction to review an appeal it would otherwise not have jurisdiction to entertain. As stated in *Meraz-Reyes v. Gonzales*, 436 F.3d 842, 843 (8th Cir. 2006), "[a] petitioner may not create the jurisdiction that Congress chose to

remove simply by cloaking an abuse of discretion argument in constitutional garb." (cleaned up). *See also Harris v. Mangum*, No. CV 13-02280-PHX-SRB (DKD), 2015 WL 13603406, at *2 (D. Ariz. Mar. 23, 2015) (holding that an order dismissing "a § 1983 action did not invoke the Supreme Court's original jurisdiction under Article III and, absent specific circumstances, . . . a litigant may not directly appeal a District Court judgment to the U.S. Supreme Court"); *Union Pac. R. Co. v. ConAgra Poultry Co.*, 189 F. App'x 576, 579 (8th Cir. 2006) (holding that "[p]retrial discovery orders are almost never immediately appealable"); *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377 (1981) (noting that the Supreme Court generally denies review of pretrial discovery orders); *White v. Nix*, 43 F.3d 374, 377-78 (8th Cir. 1994) (concluding that "the discretionary resolution of discovery issues precludes the requisite controlling question of law"). Accordingly, the Court finds that LeGrand's notice of appeal to the Supreme Court is insufficient to divest this Court of its jurisdiction; thus, the Court retains jurisdiction to consider defendants' motions for summary judgment.

In his objections and clarification of his notice of appeal, LeGrand questions the undersigned's impartiality. Docket 135 at 5; Docket 140 at 3. He accuses, without any supporting facts, the undersigned of being "influenced and swayed through ex parte communications with the Attorney Generals Office[.]" Docket 135 at 5 (capitalization in original omitted). Under 28 U.S.C. § 144, a party may seek recusal of a judge by filing a legally sufficient affidavit that demonstrates a personal bias or prejudice of the judge. *United States v.*

6

*Faul,* 748 F.2d 1204, 1210 (8th Cir. 1984). "An affidavit must strictly comply with all of the statutory requirements before it will effectively disqualify a judge." *United States v. Anderson*, 433 F.2d 856, 859 (8th Cir. 1970). LeGrand's objections, notice of appeal, and clarification do not comply with 28 U.S.C. § 144.

Moreover, even if LeGrand had filed a legally sufficient affidavit, his submissions are factually insufficient. To succeed on a personal bias claim, LeGrand must allege specific facts, not mere conclusions or generalities. *See Alexander v. Medtronic, Inc.,* 2012 WL 3724052, at *3 (W.D. Mo. Aug. 27, 2012). LeGrand does not include any such facts. While he argues that many of this Court's adverse rulings have violated his Constitutional rights, "[a]dverse judicial rulings, however, almost never constitute a valid basis for recusal; the proper course for a dissatisfied litigant is appeal." *Dossett v. First State Bank,* 399 F.3d 940, 953 (8th Cir. 2005) (internal quotation and citation omitted). LeGrand has not proffered any specific facts to support his allegations of bias or partiality, and there is no basis for recusal. Thus, this Court now considers defendants' motions for summary judgment as well as the other pending motions.

## FACTUAL BACKGROUND

Because defendants move for summary judgment, the court recites the facts in the light most favorable to LeGrand. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). In accordance with D.S.D. Civ. LR 56.1.A, defendants filed a statement of material facts presenting each

7

material fact "in a separate numbered statement with an appropriate citation to the record in the case." *See* Dockets 61, 104. As the party opposing summary judgment, LeGrand "must respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1.B. "All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1.D; *see also* Fed. R. Civ. P. 56(e)(2) (providing that the court can consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). This rule applies even when the nonmoving party is proceeding pro se. *Johnson v. Kaemingk*, 4:17-CV-04043-LLP, 2020 WL 1441713, at *1 (D.S.D. Mar. 23, 2020) (deeming facts admitted where a pro se plaintiff filed an opposition to a motion for summary judgment but did not comply D.S.D. Civ. LR 56.1.(B)); *Joe v. Walgreens Co/ILL*, 4:09-CV-04144-RAL, 2010 WL 2595270, at *1 (D.S.D. June 23, 2010) (deeming facts admitted where a pro se nonmoving party did not submit a statement of material facts or directly respond to the moving party's statement of material facts); *see also Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1067 (8th Cir. 2017) (holding that a litigant's pro se status does not excuse him from following the district court's local rules).[3]

---

[3] When the Court entered a Scheduling Order, the Court directed that copies of the District of South Dakota's Local Civil Rules of Practice and Federal Rules of Civil

Although LeGrand has filed pleadings opposing defendants' motions for summary judgment, *see* Dockets 72, 110, he has not responded to defendants' statements of material facts, Docket 61, 104, with separately numbered paragraphs and appropriate citations to the record, as required by D.S.D. Civ. LR 56.1.B. In his "Statement of Disputed Facts," LeGrand asserts that health service staff and inmates will testify how Dupuytren's contracture affected him. Docket 109 at 4. He also contends that Dr. McPherson will testify that his "continued course of treatment, requires that only Gabapentin's [sic] or stronger narcotic pain medication in-combination with the anti-inflamatories [sic] is effective course of treatment for pain management, for someone like LeGrand, with the injuries he has sustained and suffers from." *Id.* at 5 (capitalization in original omitted). To overcome defendants' motion for summary judgment, LeGrand must cite particular materials in the record such as depositions, documents, affidavits, declaration, or interrogatory answers. Fed. R. Civ. P. 56(c)(1)(A). He "may not simply rest on the hope of discrediting the movant's evidence at trial." *Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) (internal quotation omitted). Because LeGrand did not cite to any record evidence in his "Statement of Disputed Facts," he has not complied with D.S.D. Civ. LR 56.1.B. Thus, all the statements in defendants' statements of material fact, Dockets 61, 104, are deemed to be admitted. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001) (stating that a plaintiff's pro se

---

Procedure 26, 33, 34, 36, 37, and 56 be provided to LeGrand. Docket 14 ¶ 4; Docket 14-1.

status does not excuse him from responding to a motion for summary judgment "with specific factual support for his claims to avoid summary judgment[]") (citing Fed. R. Civ. P. 56(e)).

LeGrand's complaint and amended complaint are verified. Docket 1 at 7; Docket 30 at 25. He has also filed an affidavit and various supplemental documents, including medical records and documents generally related to the SDDOC's administrative remedy policy. *See* Docket 3, 31, 43. Although the court is not required to "plumb the record in order to find a genuine issue of material fact[,]" *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996), the court will consider any specific, non-conclusory facts alleged in these documents, *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 995 (8th Cir. 2001) ("[T]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion.").

## I.    Dupuytren's Contracture

LeGrand was diagnosed with Dupuytren's contracture in 2013. Docket 61 ¶ 13. Dupuytren's contracture is incurable and unpredictable. *Id.* ¶ 14; Docket 60 ¶ 50 (internal citation omitted). There are multiple patterns of disease progression. Docket 60 ¶ 50. In some patients, the disease progresses gradually and does not progress to severe contracture, but in others, the disease progresses rapidly and causes significant functional impairment. Docket 60 ¶ 50 (internal citation omitted). Treatment options include percutaneous and open fasciotomy, injection of collagenase, radiation therapy and subtotal or complete palmar fasciotomy. *Id.* ¶ 51 (internal citation omitted).

Studies have shown that treatment outcomes are highly variable in the short
and long term. *Id.* ¶ 52 (internal citation omitted); Docket 61 ¶ 15. Regardless
of the treatment, however, contracture recurrence is expected and nearly
inevitable following treatment for Dupuytren disease. Docket 60 ¶ 52 (internal
citation omitted); Docket 61 ¶ 15. Surgery generally provides the best
opportunity for long-term functional improvement, but complete restoration of
hand function is unlikely. Docket 60 ¶ 53 (internal citation omitted); Docket 61
¶ 16. Surgery does not cure Dupuytren's contracture, and recurrence rates are
high. Docket 60 ¶ 53 (internal citation omitted); Docket 61 ¶ 17. Several
drawbacks to surgery exist; complications of surgery occur frequently and are
varied. Docket 60 ¶¶ 53, 54 (internal citations omitted); Docket 61 ¶ 16.
Managing recurrent disease is challenging. Docket 60 ¶ 55 (internal citation
omitted). "Surgery in patients with recurrent disease is usually more
challenging because scarring and anatomic distortion from prior procedures(s)
increases the likelihood of neurovascular complications." *Id.* (internal quotation
omitted). Patients undergoing fasciotomy for recurrent disease are more likely
to experience either digital nerve injury or digital artery injury than patients
with primary disease. *Id.* ¶¶ 55, 56 (internal citations omitted).

Dupuytren's contracture is characterized by modular thickening,
fibrosis, and contracture of the palmar fascia, with a drawing up of one or more
fingers with flexion at the metacarpophalangeal joint. Docket 61 ¶ 117.  The
condition may be initially painful, but the pain decreases as the condition

progresses. *Id.* ¶ 118. Patients with Dupuytren's contracture generally seek medical attention for functional disability rather than for pain. *Id.*

## II.    LeGrand's Treatment During Dr. Carpenter's Tenure as Medical Director

Dr. Carpenter was employed by the South Dakota Department of Health and served as the Medical Director for Correctional Health Care from November 2012 until October 31, 2022. Docket 58 ¶ 2. During an appointment with Dr. Scott McPherson, an orthopedic surgeon with CORE Orthopedics on May 22, 2013, LeGrand stated that he was "interested in trying to do something definitive for his Dupuytren's contracture." Docket 1-1 at 10; Docket 61 ¶ 21. A Xiaflex injection was one treatment option identified by Dr. McPherson. Docket 1-1 at 10; Docket 61 ¶ 21. Because of the location of LeGrand's nodule/cord, Dr. McPherson was concerned whether he would be able to inject the area without putting the flexor tendons at risk. Docket 1-1 at 10; Docket 61 ¶ 22. Therefore, Dr. McPherson recommended a limited open fasciotomy on the ring finger and little finger. Docket 1-1 at 10; Docket 61 ¶ 22.

On June 20, 2013, LeGrand underwent a fasciotomy on his left ring and small fingers to treat his Dupuytren's contracture. Docket 1-1 at 11–12; Docket 61 ¶ 23. During his post-procedure follow-ups, LeGrand reported that he was doing well and had no specific complaints. Docket 1-1 at 8–9; Docket 61 ¶¶ 23, 24.

On August 22, 2014, approximately fourteen months after the fasciotomy, LeGrand saw Dr. McPherson for some recurrent and new onset Dupuytren's contracture. Docket 1-1 at 7; Docket 61 ¶ 25. LeGrand reported

that his left ring finger had continued to do well, but there was some recurrence on his left small finger. Docket 1-1 at 7; Docket 61 ¶ 25. LeGrand also reported that he was getting a contracture on his left index finger and along his right thumb. Docket 1-1 at 7; Docket 61 ¶ 25. After examining LeGrand, Dr. McPherson discussed treatment options with LeGrand. Docket 1-1 at 7. Because LeGrand had demonstrated a propensity for recurrence, Dr. McPherson was in favor of Xiaflex injection treatments. *Id.*; Docket 61 ¶ 26. Dr. McPherson also discussed a repeat surgery, but indicated that the Xiaflex noninvasive option might be better in the long run because of the propensity for recurrence. Docket 1-1 at 7; Docket 61 ¶ 27.

On December 4, 2014, LeGrand was seen again at CORE Orthopedics for recurrent Dupuytren's contracture on both hands. Docket 1-1 at 1. LeGrand reported that the State had denied Dr. McPherson's previous recommendation for Xiaflex injections. *Id.* After an examination on December 4, 2014, LeGrand was diagnosed with recurrent Dupuytren's contracture affecting multiple joints on both hands. *Id.* Xiaflex injections were recommended, but the option of proceeding with repeat Dupuytren's contracture release was also discussed. *Id.*; Docket 61 ¶¶ 29, 30. On June 20, 2015, LeGrand underwent a Dupuytren's contracture release of his left small and ring fingers. Docket 1-1 at 2; Docket 61 ¶ 31.

During an appointment on August 18, 2015, LeGrand reported problems with Dupuytren's contracture on his right thumb and right middle finger. Docket 1-1 at 2; Docket 61 ¶ 32. He was diagnosed with bilateral Dupuytren's

contracture on his right thumb, right middle finger, left index finger, and left small finger as well as palmer based multiple nodules of the fingers on his right hand. Docket 1-1 at 2. Dr. McPherson indicated that LeGrand would benefit from Xiaflex injections. *Id.*; Docket 61 ¶ 32. On September 21, 2015, LeGrand underwent the recommended injections. Docket 1-1 at 3; Docket 61 ¶ 33. The injections produced an excellent result. Docket 1-1 at 4; Docket 61 ¶¶ 33–35.

LeGrand was seen again at CORE Orthopedics on December 7, 2016, for follow up of his bilateral Dupuytren's contracture. Docket 1-1 at 5; Docket 61 ¶ 36. Dr. McPherson noted that LeGrand has the "diaphysis for rather aggressive Dupuytren's and recurrence." Docket 1-1 at 5; Docket 61 ¶ 36. Treatment options were discussed with LeGrand, and Dr. McPherson stated that LeGrand was "an excellent candidate to proceed with Xiaflex injections followed by manipulation." Docket 1-1 at 5; Docket 61 ¶ 37. Michael Hanvey, a physician's assistant, submitted an authorization request to schedule an appointment with Dr. McPherson for injections. Docket 61 ¶ 38. Dr. Carpenter denied the request for injections because LeGrand's physicians had "tried two different treatments for this condition and both [had] failed[.]" *Id.* ¶ 39 (quoting Docket 1-1 at 18). In Dr. Carpenter's opinion, LeGrand "may need to consider PT [physical therapy] to prevent progression[.]" *Id.* (quoting Docket 1-1 at 18). Dr. McPherson had previously instructed LeGrand to "continue to work on range of motion until maximal gains are met." *Id.* ¶ 40 (quoting Docket 1-1 at 2).

14

LeGrand saw Dr. Gregory E. Mumm, Avera Medical Group Rheumatology, on July 19, 2021. *Id.* ¶ 41. During that visit, Dr. Mumm noted that prior surgeries had not been very helpful and recommended a steroid ointment. *Id.* On September 8, 2021, an authorization request was submitted for a consult with a hand surgeon for bilateral Dupuytren's contracture. *Id.* ¶ 42. Dr. Carpenter denied this request because "previous approved treatments have not been successful[.]" *Id.* ¶ 43 (quoting Docket 1-1 at 27).

On January 27, 2022, LeGrand submitted a Kite-Request stating that he had been "waiting since 12-17-2021 for an answer from Mary Carpenter." *Id.* ¶ 44 (quoting Docket 56-2). LeGrand asked to be called to sick call for his hands and stated that "[w]e need to do something <u>now</u>!" *Id.* (quoting Docket 56-2). LeGrand was seen by Health Services on January 28, 2022, for unresolved hand pain. *Id.* ¶ 45. LeGrand stated that he would like to be seen by a provider for an increase in Gabapentin and to discuss the denied authorizations for treatment for his hand. *Id.* A provider, Dr. Sultana, saw LeGrand on February 1, 2022. *Id.* ¶ 46. LeGrand reported to Dr. Sultana that "the pain [was] getting worse [and] the range of motion has become limited [and] the contractures have been getting worse." *Id.* (quoting Docket 56-5 at 3). Dr. Sultana increased LeGrand's dose of Gabapentin, gave him a referral to orthopedics, and a consult to physical therapy for hand therapy. *Id.* ¶ 47.

When LeGrand saw a physical therapist on February 24, 2022, the physical therapist indicated that he did not think that conservative therapy would be of any benefit and stated that an assessment by a hand surgeon

15

might make sense. *Id.* ¶¶ 48, 49. LeGrand was seen by Dr. McPherson on March 23, 2022, for "evaluation of his bilateral hand symptoms, which appear to be Dupuytren's contractures." *Id.* ¶ 51 (quoting Docket 56-8 at 1). Dr. McPherson noted that "[t]his has been ongoing for a few years now." *Id.* (quoting Docket 56-8 at 1). Dr. McPherson discussed various treatment options including doing nothing other than monitoring the symptoms; conservative treatment including rest, ice/heat, NSAIDS and/or Tylenol, bracing, injections, and therapy, and surgical intervention. *Id.* ¶ 52. According to Dr. McPherson's note, he did not believe that injections would provide as much benefit as surgery because of the extent of the Dupuytren's contractures. *Id.* ¶ 53. LeGrand stated that he wanted to proceed with surgery. Docket 56-8 at 2. The plan of care that LeGrand and Dr. McPherson agreed upon was a right index/middle/ring finger palmar fasciectomy with contracture release and possible capsular ligament release, as well as fasciectomy of first webspace cord. Docket 61 ¶ 53.

On March 29, 2022, LeGrand was seen in Health Services, and Dr. Sultana submitted an authorization request for LeGrand to undergo surgery for Dupuytren's contracture as recommended by Dr. McPherson during the March 23, 2022, appointment. *Id.*¶ 54. Dr. Carpenter did not authorize surgery because Dr. McPherson had offered bracing and other conservative treatment. *Id.* ¶ 55. Dr. Carpenter wanted LeGrand to avail himself of all available conservative treatment before proceeding with another invasive surgery. *Id.* ¶ 56. Dr. Carpenter noted that LeGrand would probably need an appointment

16

with an occupational therapist for bracing. *Id.* ¶ 57. During an encounter with Health Services on May 9, 2022, an authorization for a brace as well as an authorization for consultation with a surgeon were completed. *Id.* ¶ 58. On May 25, 2022, Dr. Carpenter denied the authorization request for a surgical consult because LeGrand was scheduled to see an occupational therapist on May 31, 2022, regarding a brace for symptom relief. *Id.* ¶ 60; Docket 1-1 at 37; Docket 58 ¶ 34. LeGrand was seen by an occupational therapist on May 31, 2022, for "[c]ustom extension orthosis for right and left hands/wrist/forearm for night." Docket 61 ¶ 61 (quoting Docket 56-16 at 1). During the appointment, LeGrand "report[ed] comfortable fit with the custom fabricated right and left forearm-based nighttime finger extension orthosis for the involved fingers of the right hand and left hand." *Id.* ¶ 62 (quoting Docket 56-16 at 2 (alteration in original)). An order for orthotics for one year was placed. *Id.* (citing Docket 56-16 at 1). The occupational therapist documented that there was "[g]ood potential to reach the established goals[.]" *Id.* ¶ 63 (quoting Docket 56-16 at 2).

When LeGrand was seen by Health Services on June 13, 2022, he reported that he had been wearing the braces with no improvement in his pain. *Id.* ¶ 64. The nurse who assessed LeGrand documented that he "need[ed] more education on when to use braces and duration of use." *Id.* (quoting Docket 56-17 at 1) (alteration in original). But LeGrand was adamant about meeting with a provider to discuss surgery options. *Id.* ¶ 65. In Dr. Carpenter's assessment, LeGrand had already made his mind up about surgery and was unwilling to consider other treatment options. *Id.* ¶ 66. Dr. Sultana saw LeGrand on June

17

23, 2022. Docket 56-18. LeGrand reported to Dr. Sultana that had "been compliant with the hand braces for greater than 2 months with no significant relief of symptoms." *Id.* at 3. According to LeGrand, he had been "trying to be compliant with the braces" but they were "interfering with his daily activities." Docket 61 ¶ 67 (quoting Docket 56-18 at 3).

Because LeGrand reported that he had been compliant with the braces without any significant relief of his symptoms, Dr. Sultana requested authorization for an appointment with orthopedic surgery for bilateral Dupuytren's contracture. Docket 56-19 at 1. The request was approved, and LeGrand was scheduled to see Dr. McPherson at Avera Orthopedics on August 2, 2022. *Id.* On July 12, 2022, LeGrand had a follow-up appointment with Dr. Mumm, an Avera rheumatologist. Docket 61 ¶ 72. Dr. Mumm noted that LeGrand had "prominent dupuytren's contractures of L>R hand." Docket 56-20 at 1. Dr. Mumm also noted that LeGrand's "[s]ymptoms have progressed over time and conservative strategies have not been very effective." *Id.* at 2. Dr. Mumm agreed with hand surgery evaluation for the progressive hand contractures. Docket 61 ¶ 72.

Dring an appointment with Dr. McPherson on August 2, 2022, LeGrand reported that bracing had not improved his symptoms and that he felt like his hands were starting to contract even more. *Id.* ¶ 79. According to LeGrand, because the braces put pressure over the nodules, they increased his pain. *Id.* LeGrand also complained that his symptoms affected his daily activities because he could not dribble a basketball, and when he worked, he dropped

18

things. *Id.* ¶ 80. The provider had no treatment recommendations other than surgery. Docket 56-28 at 2. Dr. Carpenter approved the request for surgical intervention on August 18, 2022. Docket 61 ¶ 82. Although Dr. Carpenter had refused to authorize surgery in March 2022, at that time, the orthopedic surgeon consultant had offered splinting as an option to improve LeGrand's symptoms. *Id.* ¶ 85. In August 2022, the orthopedic surgeon consultant documented that conservative therapy had failed and that surgery was the only possible treatment option. *Id.* ¶¶ 84-85. Dr. Carpenter's decision to authorize surgery was also based, in part, on LeGrand's report that he was not able to hold objects, which made it difficult for him to perform daily activities. *Id.* ¶ 86. On October 14, 2022, LeGrand underwent the recommended surgery on his right hand. *Id.* ¶ 90.

During a post-operative follow-up appointment, LeGrand reported that he was very satisfied with the result of right release and requested that he be referred for left index and small finger contracture release. *Id.* ¶ 94. In accordance with Dr. McPherson's recommendation, LeGrand was scheduled for surgery on his left hand on February 22, 2023. *Id.* ¶ 96. Because "Avera scheduled as [a] clinic visit instead of surgery" on February 22, 2023, the recommended surgery was not performed until March 27, 2023. *Id.* ¶¶ 99, 100 (quoting Docket 56-42 at 1). After the March 27, 2023, procedure, LeGrand had "excellent extension of the DIP joint" and "full extension of the PIP joint." *Id.* ¶ 106 (quoting Docket 58 ¶ 73).

### III.    LeGrand's Treatment during Dr. Haynes's Tenure as Medical Director

Dr. Aaron Haynes was appointed as the Chief Medical Officer for the Division of Clinical and Correctional Services with the SDDOC in October 2022. Docket 103 ¶ 3. On May 4, 2023, LeGrand had a post-operative follow-up appointment with Dr. McPherson. Docket 104 ¶ 12; Docket 101-122. During the appointment, LeGrand reported that he was not currently experiencing pain, but Dr. McPherson noted that LeGrand complained of "some burning dysesthesia on the small finger likely from dissection around the digital nerves[.]" Docket 104 ¶¶ 12, 13; Docket 101-122 at 1, 3. Dr. McPherson recommended a trial of Gabapentin. Docket 104 ¶ 13. LeGrand had previously been prescribed Gabapentin and had been instructed to take one 300 milligram tablet four times a day, but the Gabapentin order had expired. *Id* ¶ 14. On May 5, 2023, the day after LeGrand's follow-up appointment, a provider was asked to review LeGrand's chart because his Gabapentin order had expired. *Id.* ¶ 15. After the chart review, the provider who is not a named defendant, noted that "Gabapentin is no longer formulatory [sic]. This medication will not be renewed." Docket 101-18 at 2.

On May 6, 2023, LeGrand was seen by a nurse in Health Services and reported that "his gabapentin was abruptly discontinued and he understands that the prison is moving away from the medication." Docket 101-19 at 1. LeGrand refused ibuprofen and requested "an alternative medication because he did not wean down off the gabapentin that he report[ed] being on for 5 years for the nerve pain." *Id.* Dr. Rector prescribed Cymbalta and instructed LeGrand

20

to make an appointment with the provider if he wanted to discuss the prescription. Docket 104 ¶¶ 19, 198. LeGrand submitted a kite with questions regarding Dr. McPherson's recommendation for a trial of Gabapentin and was advised that "a non-form request [had] been sent for this Order and [Nursing Staff] were awaiting approval/denial." *Id.* ¶ 20 (quoting Docket 103 ¶ 15) (brackets in original). Dr. Haynes elected not to follow Dr. McPherson's recommendation for Gabapentin. *Id.* ¶ 21. Dr. Haynes's decision was based, in part, on Dr. McPherson's medical record noting that the burning sensation was limited to the "small finger" and was "likely from the dissection around the digital nerves." *Id.* (quoting Docket 103 ¶ 16). In Dr. Haynes's opinion, the "very limited area of neuropathic pain" would be best managed by topical agents if Cymbalta was ineffective. *Id.* ¶ 22 (quoting Docket 103 ¶ 17). LeGrand was advised, by correspondence dated, May 9, 2023, that he has "a new prescription for duloxetine[4] 30mg, take 1 cap daily for nerve pain." Docket 101-24.

LeGrand requested to be seen by Health Services to discuss the new prescription. Docket 101-25. He reported that he cannot tolerate duloxetine and needs the medication Dr. McPherson prescribed. *Id.* On May 12, 2023, a nurse in Health Services assessed LeGrand. Docket 101-26. LeGrand reported that he "used to take Cymbalta back in approx. 2017–2019 and stated that it

---

[4] Cymbalta is the brand name for duloxetine.
https://www.drugs.com/duloxetine.html (last visited Feb. 27, 2025).

did not help his pain at all, and made him feel sick[.]" *Id.* at 2. LeGrand's pain did not radiate up his arms and was localized in his fingers and palms. *Id.*

On May 17, 2023, Dr. Rector directed Health Services to inform LeGrand that Gabapentin had not been approved and he should continue to take duloxetine. Docket 104 ¶¶ 28, 199. Dr. Rector also indicated that the duloxetine could possibly be increased if needed and topical agents like Voltaren gel could be considered. *Id.* ¶ 28. Subsequently, LeGrand was informed that Voltaren gel had been ordered and that he had been scheduled for a provider visit to discuss pain management. *Id.* ¶¶ 30, 31.

Dr. Rector saw LeGrand on May 30, 2023, to discuss pain medication. Docket 101-32; Docket 104 ¶ 200. LeGrand expressed frustration that Health Services "was not following the advice of his orthopedist who wanted him on gabapentin after surgery for 90 days." Docket 101-32 at 2. LeGrand reported that he been compliant with the prescribed pain modalities and requested that Dr. Rector re-submit a request for Gabapentin. *Id.* at 2–3. Dr. Rector reviewed LeGrand's chart and located a reference to Gabapentin for thirty days after surgery. *Id.* at 3. Dr. Rector resubmitted a request for 30 days of Gabapentin to "quell post-surgical 'nerve' pain." *Id.* at 4; Docket 104 ¶ 200. Dr. Rector also submitted a "non-form request" for Vitamin E cream to help soften the scar tissue and put in a referral for a nerve conduction study to "help clarify the degree of nerve pain." Docket 101-32 at 4. Finally, Dr. Rector suggested an occupational referral to help with fine motor movement of the hands. *Id.* Dr. Haynes denied the request for Vitamin E cream because "several lotions are

available on commissary[,]" but he approved the request for Gabapentin for 30 days. Docket 101-33 at 1. Dr. Haynes ordered a nerve conduction study and authorized a referral for occupational therapy to help with fine motor movements of the hands including writing and gripping small tools. *Id.* at 2.

When LeGrand was seen by Health Services on June 18, 2023, he reported that the "gabapentin helps but only to an extent and he is still experiencing a lot of pain in bilateral hands, but mainly left hand." Docket 101-38 at 1. LeGrand was given acetaminophen for pain and reminded that he had been approved for an EMG, a nerve conduction study, on both hands. *Id.* at 4. LeGrand was seen again by Health Services on June 24, 2023, for continued hand pain. Docket 104 ¶ 55. He reported that he was "still experiencing pain, in bilateral hands." *Id.* (quoting Docket 101-40 at 4). According to LeGrand, Gabapentin and over the counter pain medication helps, but his pain has not really gotten better and does not go away. *Id.* On July 4, 2023, LeGrand submitted a kite "begging" to see Dr. Rector for pain. Docket 101-42. Because he had had two visits to sick call (June 18 and June 24) for hand pain and multiple inquiries to nurses trying to get an appointment with Dr. Rector, LeGrand assumed that Dr. Rector "refuses to see [him] <u>or</u> is completely unavailable/unaware of [his] needs." *Id.*

Dr. Rector was not authorized to prescribe Gabapentin since it was "no longer formulary." Docket 104 ¶ 58. A "non-form" request had to be approved by Dr. Haynes, the Chief Medical Officer. *Id.* On July 5, 2023, Dr. Haynes denied the "non-form" request and directed the nursing staff to wean LeGrand

off of Gabapentin. *Id.* ¶ 58. Dr. Haynes noted that Dr. McPherson had recommended a trial of Gabapentin to see if it would be helpful and also noted that because of "abuse potential," the medical staff should consider other options for small finger discomfort. Docket 101-43.

LeGrand saw Dr. Rector on July 11, 2023, for "ongoing hand pain." Docket 101-45 at 2; Docket 104 ¶ 201. He reported that his "pain has not gotten better since surgery[.]" Docket 101-45 at 2. Dr. Rector noted that Dr. McPherson had recommended Gabapentin for post-operative pain control, but "[w]e are now beyond that recommendation, [and] patient states that his hands still hurt[.]" *Id.* LeGrand stated that "the gabapentin works so this should not be stopped." *Id.* Dr. Rector discussed alternative treatments to alleviate LeGrand's pain, but LeGrand declined the offered treatments, although he "reluctantly accept[ed] a prescription for max dose tylenol." *Id.* at 2–3; Docket 104 ¶¶ 201, 202. Dr. Rector spend time "discussing the subjective nature of 'pain' and how objective testing or post surgical status would be needed for non-formulary, stronger, controlled substance medications to continually be prescribed." Docket 101-45 at 3; Docket 104 ¶ 203.

On or about July 12, 2023, LeGrand submitted an Informal Resolution Request (IRR) requesting biweekly appointments with Dr. McPherson and Gabapentin three times daily. Docket 104 ¶ 70. In response to LeGrand's IRR, Health Services reminded him that Gabapentin is a non-formulary medication and that Dr. Haynes had denied a request for Gabapentin a few days earlier. Docket 101-48 at 1. When Dr. Rector informed LeGrand that Dr. Haynes had

24

denied the request for Gabapentin, Dr. Rector discussed and offered other options to alleviate LeGrand's symptoms, all of which LeGrand refused except the maximum dose of Tylenol. *Id.* Health Services stated that LeGrand had an upcoming appointment with neurology and advised that biweekly appointments with Dr. McPherson would not be ordered because Dr. McPherson had not recommended them. *Id.*

On August 4, 2023, LeGrand submitted a kite requesting to be seen by Health Services for hand pain following the EMG study he had had on August 2, 2023. Docket 104 ¶ 73. The next day, August 5, 2023, a nurse in Health Services assessed LeGrand, and LeGrand reported that "the areas that were sutured back together after the surgery [were] very sensitive." *Id.* ¶ 74 (quoting Docket 101-50 at 4) (brackets in original). LeGrand's chief complaint was burning and tingling in his hands with limited range of motion. Docket 101-50 at 1. LeGrand also reported that Gabapentin had helped when he was taking it. *Id.* The nurse created a provider referral, and Dr. Rector saw LeGrand on August 8, 2023. Docket 104 ¶ 75.

During the August 8, 2023 encounter, LeGrand reported to Dr. Rector that the pain in his hands is "bilateral and involves the scars from previous surgery as well as the lateral thumbs and fingertips where he feels numbness/tingling/cold pins-and-needles." Docket 101-51 at 2; *see also* Docket 104 ¶ 75. He reported that his grip strength is "fairly strong, but he cannot extend his fingers fully." Docket 101-51 at 2; Docket 104 ¶ 76. Because of loss of dexterity, LeGrand had been relegated to a less technical job and

reported frustration with his limitations. Docket 101-51 at 2; Docket 104 ¶ 76. LeGrand asked Dr. Rector about his EMG results, and Dr. Rector informed LeGrand that the results were not yet available to Health Services. Docket 101-51 at 3; Docket 104 ¶ 77. On examination, Dr. Rector noted that multiple linear fasciectomy scars were well healed, but the scars were tender with palpation, which was worse when LeGrand tried to extend his fingers fully. Docket 101-51 at 3. Dr. Rector's assessment was "[v]olar linears scars causing burning/sharp pain with any pressure." *Id.* at 4; Docket 104 ¶ 204. Dr. Rector also documented that LeGrand "experiences numb, cold tingle, needles, lack of any sensation in tips of fingers and all down the thumbs." Docket 101-51 at 4. Dr. Rector's plan was to review the EMG results and treat accordingly. *Id.*; Docket 104 ¶ 77. Dr. Rector also requested an orthopedic follow-up for the "sensitive, painful areas of scar tissue." Docket 101-51 at 4; Docket 104 ¶¶ 77, 204, 205. Finally, Dr. Rector submitted a non-formulary drug request for vitamin E cream or oil. Docket 101-52; Docket 104 ¶¶ 78, 206. In the request, Dr. Rector explained that because the scar tissue was "sensitive, painful, and restrictive to motion[,]" he wondered if vitamin E cream would soften the scars and improve range of motion over time. Docket 101-52; Docket 104 ¶¶ 78, 206. Dr. Haynes approved the request for vitamin E cream, but did not authorize an orthopedic surgery referral because he wanted to try vitamin E cream first. Docket 101-53 at 2; Docket 101-59 at 2; Docket 104 ¶ 79.

On August 20, 2023, LeGrand sent a kite requesting to be seen in Health Services for a new lump or contracture the middle finger of his left hand.

Docket 101-56. When a nurse assessed LeGrand, the nurse noted a hard mass just below the skin which could have been scar tissue. Docket 101-57 at 1; Docket 104 ¶ 81. LeGrand denied that the lump was scar tissue and stated that "the surgery he had for his contractures was not done right and he needed to be taken down to surgery immediately to get it fixed." Docket 101-57 at 1; Docket 104 ¶¶ 80–81. Nursing staff asked Dr. Rector to talk to LeGrand. Docket 101-57 at 1; Docket 104 ¶ 81. Dr. Rector suggested that the lump could be scar tissue or a cyst, and this response upset LeGrand. Docket 101-57 at 1; Docket 104 ¶ 82. Because the lump had been present for less than 24 hours, the plan was to recheck it in one week. Docket 101-57 at 1; Docket 104 ¶ 83. LeGrand was instructed to return to Health Services "ASAP" if the lump got bigger before the week was up. Docket 101-57 at 1; Docket 104 ¶ 83.

LeGrand submitted another kite on August 22, 2023, stating that the lump had gotten noticeably worse and had doubled in size. Docket 101-58; Docket 104 ¶ 84. The nurse who assessed LeGrand noted a "pea size mass under the skin between his first and second knuckle." Docket 101-60; Docket 104 ¶ 85. LeGrand reported that the lump hurts and burns when it is touched or when he tries to grab things. Docket 101-60. Because the nurse had not observed the lump during LeGrand's previous visit to Health Services, the nurse asked Dr. Rector to assess LeGrand. *Id.*; Docket 104 ¶ 85. LeGrand asked about the EMG results, and a nurse advised LeGrand that a request would be made for neurology to fax the results. Docket 101-60; Docket 104 ¶ 86. On August 23, 2023, Dr. Rector ordered that an appointment with an

27

orthopedic surgeon be scheduled to consider Xiaflex injections for painful scarring after hand surgery. Docket 101-61; Docket 104 ¶ 87.

Dr. Rector saw LeGrand on August 29, 2023, to review the EMG results. Docket 101-62 at 2; Docket 104 ¶¶ 88, 208. Dr. Rector explained that the "findings are not consistent with global hand neuropathy or radicular type of pain[]" because the EMG demonstrated localized abnormalities on one finger of each hand. Docket 101-62 at 2–3; Docket 104 ¶¶ 88, 208. Although LeGrand voiced "understanding that the findings are slight and do not match his stated bilateral hand pattern of pain[,]" he still requested Gabapentin, reporting that it had previously helped alleviate his pain. Docket 101-62 at 3; Docket 104 ¶¶ 89, 209. Dr. Rector submitted yet another non-formulary drug request for Gabapentin. Docket 101-64 at 3; Docket 104 ¶¶ 94, 210. Dr. Rector discussed Cymbalta, but LeGrand reported that he had tried it in the past without any relief of his symptoms and did not want to "try medication without known benefit." Docket 101-64 at 3; Docket 104 ¶ 90. LeGrand informed Dr. Rector that compression helps relieve some of his pain, so Dr. Rector submitted a non-formulary request for hand compression gloves. Docket 101-64 at 3, 5; Docket 104 ¶¶ 91, 211. LeGrand reported that he had not received the vitamin E cream that Dr. Rector had previously recommended, so Dr. Rector requested that the nursing staff verify that the cream had been delivered correctly. Docket 101-64 at 3; Docket 104 ¶¶ 92, 210. Because LeGrand was open to trying a TENS unit, Dr. Rector arranged for a TENS unit trial. Docket 101-64 at 3, 5; Docket 104 ¶¶ 93, 210. Dr. Rector reiterated that LeGrand had an upcoming

28

orthopedic consultation for his persistent hand pain following surgery. Docket 101-64 at 3, 5; Docket 104 ¶ 93.

Dr. Haynes did not approve the request for Gabapentin. Docket 101-64; Doket 104 ¶ 95. When Dr. Haynes reviewed LeGrand's medical records, he noted that LeGrand has a history of Gabapentin misuse. Docket 103 ¶ 92; Docket 104 ¶ 95. Because the EMG had indicated that the neuropathy was localized to two fingers, in Dr. Haynes's opinion, the risks of Gabapentin outweighed the benefits. Docket 101-64 at 1; Docket 104 ¶ 95. After Dr. Haynes declined the request for Gabapentin, Dr. Rector notified LeGrand that the plan to manage his hand pain was applying vitamin E cream to the scars, a TENS unit, and an upcoming orthopedic visit. Docket 101-65; Docket 104 ¶ 97. Dr. Rector also reminded LeGrand that he had submitted a non-formulary request for hand compression gloves. Docket 101-65.

On September 7, 2023, LeGrand submitted a kite requesting new batteries for his TENS unit, to be seen to review Dr. Rector's request for pain medication, and to check on the status of the request for compression gloves. Docket 101-66; Docket 104 ¶ 98. LeGrand was advised that he would get batteries for the TENS unit, and he was seen in Health Services on September 11, 2023. Docket 101-66; Docket 101-67; Docket 104 ¶ 99. The nurse who assessed LeGrand informed him that the request for Gabapentin had not been approved, but the request for compression gloves was approved. Docket 104 ¶ 99. The compression gloves were issued to LeGrand on the same day. *Id.*; Docket 101-68. LeGrand's medical chart indicates that an appointment with an

orthopedic surgeon was scheduled on September 26, 2023; an appointment with Dr. McPherson was set for November 9, at 11:00 a.m. Docket 101-69; Docket 104 ¶ 100. *But see* Docket 101-61 (stating that the November 9 appointment was approved and scheduled on August 23, 2023).

On September 29, 2023, LeGrand submitted a kite reporting that a lump on his middle finger of his right hand had gotten larger and more painful. Docket 101-70; Docket 104 ¶ 101. Dr. Rector evaluated LeGrand on October 2, 2023. Docket 101-71; Docket 104 ¶ 102. LeGrand reported that his right second finger was more painful and swollen and that he had not been using the hand at work. Docket 101-71 at 1; Docket 104 ¶ 102. On examination, Dr. Rector noted that the firm, subcutaneous lesion that had previously been palpable on the volar aspect of his right second finger was no longer present. Docket 101-71 at 1; Docket 104 ¶¶ 103, 212. But Dr. Rector noted that the surgical scar was thickened, reddened, and firm. Docket 101-71 at 1; Docket 104 ¶¶ 104, 213. Dr. Rector's plan was to address the painful scar with orthopedics during the upcoming appointment, keep using the hand as much as possible to maintain range of motion, and to use vitamin C cream to soften the area. Docket 101-71 at 1; Docket 104 ¶¶ 105, 213, 214.

LeGrand submitted kite requests on October 13 and October 14, 2023, requesting to be seen for a new lump on the pinky finger of his left hand. Docket 104 ¶¶ 106, 107. On October 15, 2023, LeGrand was seen in Health Services for the new lump on his left pinky finger. Docket 101-74 at 2; Docket 104 ¶ 108. LeGrand acknowledged that he had been seen by Dr. Rector, but he

wanted the new lump noted so that it could be addressed during his appointment with the orthopedic surgeon. Docket 101-74 at 2; Docket 104 ¶ 108. By correspondence dated October 16, 2023, LeGrand was informed that he was still scheduled for an upcoming orthopedic appointment and that he should bring his concerns to the orthopedic surgeon's attention. Docket 101-75; Docket 104 ¶ 109.

After LeGrand submitted a kite reporting that his right middle finger was starting to go numb and that pain was becoming unmanageable, LeGrand was seen by Health Services on October 29, 2023. Docket 101-79; Docket 101-80; Docket 104 ¶¶ 110, 111. LeGrand reported to the nurse who assessed him that "Gabapentin is the only thing that that helped." Docket 101-80 at 1; Docket 104 ¶ 111. The nurse concluded that no provider referral was needed at the time and reminded LeGrand that he had an upcoming orthopedic appointment. Docket 101-80 at 4; Docket 104 ¶ 112. LeGrand was informed that a nurse can only give Ibuprofen and Tylenol. Docket 101-80 at 4; Docket 104 ¶ 112.

During his November 9, 2023 appointment with Dr. McPherson, LeGrand reported itching and burning pain along his scars. Docket 101-123 at 1. LeGrand told Dr. McPherson that Gabapentin had been "quite helpful" but it is not a formulary item so he sometimes has not been able to get it. *Id.*; Docket 104 ¶ 115. Dr. McPherson concluded that LeGrand would be a candidate to proceed with Xiaflex injections for recurrent Dupuytren's in his right middle finger and small left finger. Docket 101-123 at 1; Docket 104 ¶ 118. Dr. McPherson recommended hydrocortisone cream along the scar area and

continued used of compression-type garments as needed for comfort and support. Docket 101-123 at 1; Docket 104 ¶ 118. Dr. McPherson also "strongly recommend[ed] that he be maintained on gabapentin 300 mg 3 times daily likely on a chronic basis." Docket 101-123 at 1; Docket 104 ¶ 119.

After LeGrand returned to the SDSP following his appointment with Dr. McPherson, he submitted a kite requesting to be called to Health Services to discuss Dr. McPherson's orders. Docket 101-83; Docket 104 ¶ 120. Dr. Rector requested approval of Dr. McPherson's recommendations, including Gabapentin. Docket 101-84 at 1; Docket 101-86; Docket 101-87; Docket 104 ¶¶ 215, 216. Dr. Haynes approved Xiaflex injections, but did not approve Gabapentin. Docket 101-84 at 1; Docket 101-87; Docket 104 ¶ 125. When rejecting the non-formulary request for Gabapentin, Dr. Haynes documented that the nerve conduction study demonstrated "2 finger distal neuropathy.[.]" Docket 101-84 at 1.; Docket 104 ¶ 121. On November 15, 2023, Dr. Rector directed that LeGrand be advised that Xiaflex injections had been approved, but Gabapentin was not approved. Docket 101-88; Docket 104 ¶¶ 125, 217. Dr. Rector directed LeGrand to continue with other pain relieving modalities, including compression, hydrocortisone cream, and duloxetine. Docket 101-88; Docket 104 ¶¶ 125, 217.

On November 21, 2023, LeGrand submitted a kite reporting that one of fingers was "killing" him and that lump "keeps growing, throbbing, & hurting." Docket 101-89; Docket 104 ¶ 126. Dr. Rector reviewed LeGrand's chart, noting that Tylenol was no longer working, and LeGrand was again requesting

Gabapentin. Docket 101-91 at 1; Docket 104 ¶ 127. Dr. Rector had a "hall encounter" with LeGrand, and LeGrand requested that Dr. Rector contact Dr. McPherson. Docket 101-94 at 1; Docket 104 ¶¶ 131, 219. Dr. Rector complied with LeGrand's request, and Dr. McPherson left a message for Dr. Rector reiterating his recommendation for Gabapentin for LeGrand's chronic neuropathic pain syndrome because it is non-addictive. Docket 101-91 at 2; Docket 101-94 at 1; Docket 104 ¶ 127. At LeGrand's "firm request[,]" Dr. Rector resubmitted a non-formulary drug request for Gabapentin and shared Dr. McPherson's reasoning with Dr. Haynes. Docket 101-91 at 2; Docket 101-94 at 1; Docket 104 ¶¶ 127, 131, 218. But Dr. Rector also noted that at JPA [Jameson Prison Annex] Gabapentin is considered a substance of abuse, so he was not sure that the request would be approved. Docket 101-91 at 2; Docket 104 ¶¶ 128, 218.

On November 27, 2023, Dr. Haynes rejected the non-formulary request for Gabapentin, noting "2 digit neuropathy without evidence of proximal neuropathy present. Gabapentin is in fact addictive and is a primary drug of abuse in prisons . . . . Patient is noncompliant with other therapies that would help his pain." Docket 101-94 at 1; Docket 104 ¶ 130. Dr. Rector requested that nursing staff inform LeGrand that the second request for Gabapentin had been rejected but Dr. Rector continued the Tylenol prescription even though LeGrand had reported that it was not working. Docket 101-95 at 2; Docket 104 ¶ 132. Subsequently, Dr. Rector also instructed LeGrand that he "will need to manage pain other ways: creams, steroids, other non-controlled medications,

massage, compression, exercise/stretching/strengthening, and even injections with orthopedics (to relieve tightness and scar tissue after surgery) which [they] have discussed." Docket 101-98 at 2; Docket 104 ¶¶ 136, 220.

On December 14, 2023, LeGrand was seen in Health Services "requesting gabapentin to be dispensed immediately based on outside recommendations from orthopedic physician." Docket 101-100 at 1; Docket 104 ¶ 137. The nurse who assessed LeGrand informed him that his request was denied. Docket 101-100 at 1; Docket 104 ¶ 137. The nurse educated LeGrand that

> [o]utside providers can recommend various treatment options including medications. The DOC medical provider receives . . . recommendations and considers them based on medical necessity. Outside provider recommendations are not orders that must be followed. The chief medical officer has reviewed the recommendations and denied the non-formulary request based on non-compliance with other therapies/interventions to address pain and testing shows two-digit neuropathy without evidence of proximal neuropathy.

Docket 101-100 at 1; Docket 104 ¶¶ 138–140.

After Dr. Haynes approved Xiaflex injections, Dr. Rector ordered that an appointment for injections be scheduled, and LeGrand was scheduled for an appointment with Dr. McPherson on January 24, 2024. Docket 101-101 at 1; Docket 104 ¶ 141. LeGrand submitted multiple kites in December 2023 and January 2024 requesting to be seen in Health Services for questions about Xiaflex injections. Docket 101-103; Docket 101-104; Docket 101-106; Docket 104 ¶¶ 143, 144, 146. By correspondence dated January 3, 2024, LeGrand was advised that he had been "scheduled for an appointment with a provider in

the community" but "[d]ue to policy, information regarding the date or time may not disclosed." Docket 101-107; Docket 104 ¶ 147.

During an encounter in Health Services on December 15, 2023, LeGrand was provided a compression glove. Docket 101-102; Docket 104 ¶ 142. LeGrand tried on the compression glove and "verbalized relief and proper fit." Docket 142 ¶ 142 (quoting Docket 101-102 at 1). LeGrand also stated that he had a glove for his other hand that was pending order. *Id.*; Docket 101-102 at 1.

On January 23, 2024, LeGrand saw Dr. Rector for a DOC complete physical examination. Docket 101-109 at 3. LeGrand reported that he "continues to struggle with bilateral hand pain[] [and that] [s]car tissue on palms and volar aspect of fingers is getting more painful, more restrictive, and larger in size." *Id.*; Docket 104 ¶ 148. LeGrand stated that he did not feel that his pain had been adequately treated and again requested Gabapentin. Docket 101-109 at 3; Docket 104 ¶¶ 149, 221. LeGrand denied that he had been noncompliant with Cymbalta. Docket 101-109 at 3; Docket 104 ¶¶ 150, 222. Rather, LeGrand contended that he did not want to take Cymbalta because he had experienced dizziness, head rushes, and nausea when he took the medication in 2020/2021. Docket 101-109 at 3; Docket 104 ¶¶ 150, 222. LeGrand informed Dr. Rector that he has taken Effexor even earlier and potentially in 2017 and that he had also tried Elavil in the past. Docket 101-109 at 3; Docket 104 ¶¶ 151, 222. At LeGrand's request, Dr. Rector submitted another non-formulary drug request for Gabapentin. Docket 101-110; Docket

104 ¶¶ 152, 223. LeGrand acknowledged that he was aware he had an upcoming appointment with orthopedics, but he was "distressed by the delay." Docket 101-110 at 2; Docket 104 ¶ 152. The non-formulary request for Gabapentin was denied. Docket 101-110 at 1; Docket 104 ¶ 153. When Dr. Haynes denied the request, he documented that "NCT results are mild and not consistent with the patient's pain." Docket 101-110 at 1; Docket 104 ¶ 153.

LeGrand saw Dr. McPherson on January 24, 2024, for the scheduled Xiaflex injections. Docket 101-124; Docket 104 ¶ 154. LeGrand tolerated the procedure well, and Dr. McPherson recommended that he been seen again in six or seven days to proceed with manipulation. Docket 101-124 at 3; Docket 104 ¶ 154. Health Services scheduled LeGrand for manipulation on January 31, 2024. Docket 101-111 at 1; Docket 104 ¶ 155. Following the manipulation procedure, LeGrand was able to fully extend his right middle finger and "able to get nearly full extension" of his left small finger. Docket 101-125 at 1; Docket 104 ¶¶ 158, 159. Dr. McPherson instructed LeGrand to "keep working on stretching[]" and recommended a hand therapy appointment to be fitted for nighttime finger or hand splints. Doket 101-125 at 1; Docket 104 ¶ 159.

On February 6, 2024, LeGrand submitted a kite because he noticed increased swelling, redness, and pain in his right middle finger and believed that it might be infected. Docket 101-117 ; Docket 104 ¶ 160. When a nurse assessed LeGrand the next day, LeGrand reported that his ice bag had broken and that he had not been elevating his hand very often. Docket 101-118 at 1; Docket 104 ¶ 161. After consulting a physician's assistant in Health Services,

36

LeGrand was instructed that he should aggressively elevate and ice his finger. Docket 101-118 at 4; Docket 104 ¶ 161. Health Services issued a new ice bag and arranged for the prison staff to issue a second pillow to help with elevation. Docket 101-118 at 1; Docket 104 ¶ 162.

On or about February 13, 2024, a provider in Health Services was asked to review LeGrand's medical chart concerning his request for Gabapentin. Docket 101-119; Docket 104 ¶ 163. This provider, who is not a named defendant,[5] denied LeGrand's request because Dr. Haynes had rejected LeGrand's earlier requests because his nerve conduction study results were mild and not consistent with his pain. Docket 101-119; Docket 101-120; Docket 104 ¶¶ 163, 164. Thus, Gabapentin would provide only limited benefit. Docket 101-120; Docket 104 ¶ 164.

## IV.    Dr. Rector's Allegedly Unauthorized Surgery

On April 2, 2023, LeGrand presented to Health Services for assessment of his hand. Docket 104 ¶ 169. When LeGrand removed the surgical dressing, he reported that "he noticed that on his left index finger at the base the tissue started to bulge out through the stitch." Docket 101-5 at 2. When the nursing staff examined LeGrand's hand, they observed "noticeable tissue that ha[d] bulged through the original incision." *Id.* When the nursing staff evaluated LeGrand's hand two days earlier, it did not appear this way. *Id.* A provider

---

[5] There is no record evidence indicating that Dr. Rector or Dr. Haynes were aware of LeGrand's February 2024 request. *See* Dockets 101-119, 101-120. Further, at the conclusion of the manipulation appointment, Dr. McPherson did not recommend Gabapentin. *See* Docket 101-125.

contacted LeGrand's surgeon, and the surgeon requested that LeGrand be transported the Avera Emergency Department. *Id.* The emergency room note states that LeGrand presented with concern for possible infection, but plastic surgery was consulted and concluded that the wound was not infected. Docket 101-126 at 1, 2.

LeGrand was seen in Health Services again on April 5, 2023. Docket 104 ¶ 177. Dr. Rector examined LeGrand's left hand and noted "bruising and swelling of proximal digit of 2nd finger." Docket 101-8 at 3. Although there was some soft tissue bulging through the surgical incision, the "tissue appear[ed] less vascular and protrusive than 2 days ago, and the scab around the edges appear[ed] to be healing well." *Id.* The "vertical volar sutures from the fasciectomy appear[ed] to be healing well and holding appropriately." *Id.* LeGrand had a follow-up appointment with Dr. McPherson the next week, but he did not want "to wait that long if something needed to be done sooner." *Id.* At LeGrand's request, Dr. Rector called Dr. McPherson's office to discuss next steps. *Id.*

LeGrand presented to Health Services multiple times for evaluation of a "small, pink tissue bulge through the incision on the volar aspect of 2nd digit that the surgeon left open (subcutaneous tissue exposed) to allow for healing." Docket 102 ¶ 18. He complained numerous times that the small bulge "isn't right and something HAS to be done." *Id.* When Dr. Rector was discussing next steps with Dr. McPherson's office, an orthopedic PA indicated that they might try silver nitrate (chemical cautery) or simple excision of the miniscule extra

tissue which could be described as "proud flesh" or granulation tissue. *Id.* ¶ 20. Silver nitrate is a medication that is often used for cauterization to remove granulation tissue and to stop a wound from bleeding or becoming infected. *Id.* Dr. Rector informed LeGrand that he had discussed next steps with Dr. McPherson's office, including using silver nitrate to treat the tissue protruding from the incision site. *Id.* ¶ 21. LeGrand responded that he "absolutely wanted that done[,]" and Dr. Rector proceeded to use a small iris scissors to excise a miniscule amount of granulation tissue from above the skin level. *Id.* ¶ 22. Dr. Rector did not interfere with or disrupt the surgeon's margins in any way. *Id.* ¶ 23. Because the granulation tissue that Dr. Rector excised was vascular, there was small amount of bleeding, which was not unexpected. *Id.* ¶ 24. Dr. Rector used silver nitrate to stop the bleeding. *Id.* LeGrand told Dr. Rector that he was satisfied with the intervention and informed Dr. Rector that it "looked so much better." *Id.*

Later, nursing staff checked with Dr. Rector to see if he had reached Dr. McPherson. Docket 104 ¶ 188. Dr. Rector issued a verbal order over the phone directing the nursing staff to "educate patient on healing process and letting finger heal without agitating and irritating the area." *Id.* (quoting Docket 101-10).  There were no concerns for infection, and LeGrand was instructed to continue to monitor as previously ordered. *Id.*

On April 9, 2023, LeGrand presented at Health Services with a concern that his surgical incision was infected. Docket 101-11 at 1. He was adamant about getting an ice bag and wound cultures. *Id.* at 4. The nurse who assessed

39

LeGrand's incision noted very minimal drainage that appears serosanguinous. *Id.* The wound cultures did not reveal infection. Docket 104 ¶ 190.

During his April 13, 2023, post-surgical appointment with AMG Orthopedics, LeGrand did not express any concern regarding the proud flesh removal Dr. Rector had performed. Docket 101-121. LeGrand reported that he was "doing well without any significant complaints or concerns." *Id.* at 1. He "denie[d] incisional issues." *Id.* On examination, the surgical incision site appeared to be healing well without any signs of infection. *Id.* There was "[g]ood granulation tissue healing within the open wounds[,] [and] [n]o proud flesh [was] appreciated." *Id.* LeGrand was "doing well," and the plan was to see him again in two weeks to monitor his progress and to check wound healing. *Id.* LeGrand's next appointment was on May 4, 2023. Docket 101-122. At this time, he was "doing well with the open wounds . . . now completely re-epithelialized. *Id.* at 1.

## DISCUSSION

### I.    Motion for Summary Judgment

#### A.    Legal Standard

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation omitted). The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48 (emphasis omitted). Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved . . . in favor of either party." *Id.* at 250.

### B.    Alleged Unlawful, Deceitful, and Fraudulent Conduct by the South Dakota Attorney General's Office

Throughout this litigation, LeGrand has contended that it is dishonest, deceitful, and fraudulent for the South Dakota Attorney General's Office to represent former state employees being sued for official conduct. *See, e.g.,*

Dockets 36, 44, 46, 107. The Court has rejected LeGrand's arguments and concluded that neither the Rules of Professional Conduct nor any other provision of South Dakota law, including the provisions on which LeGrand relies, prohibit the South Dakota Attorney General's Office from representing a former state employee in a lawsuit arising out of the former employee's performance of his or her duties for the State of South Dakota. Docket 77 at 5–6; Docket 132 at 10–12. In opposition to defendants' motions for summary judgment, LeGrand renews his argument that the Attorney General's Office cannot represent former state employees being sued for official conduct. Docket 72 at 2–8; Docket 109 at 7–8. LeGrand's renewed argument is rejected for the same reasons the court rejected LeGrand's earlier arguments. *See* Docket 77 at 5–6; Docket 132 at 10–12. The record does not demonstrate any dishonest, deceitful, or fraudulent conduct by the South Dakota Attorney General's Office that would be a basis for denying defendants' motions for summary judgment.

### C.   LeGrand's Objection to the Affidavit of Robert Van Demark Jr., M.D.

Defendants submitted an affidavit from a Dr. Van Demark, an orthopedic hand surgery specialist, in support of their motion for summary judgment. Docket 60. LeGrand objects to this expert affidavit and moves to strike it. Docket 72 at 9–13. First, LeGrand asserts that Dr. Van Demark's affidavit is untimely under the Court's September 25, 2023 Scheduling Order. *Id.* at 9. Second, LeGrand argues that Defendants should be precluded from relying on expert testimony because the Court denied his motions for appointment of an

42

expert witness. *Id.* at 10–13. Neither the Court's initial Scheduling Order, Docket 14, nor the Amended Scheduling Order, Docket 51, provides for a deadline to disclose expert witnesses, although the Court ordered that "all discovery, including expert discovery, shall be commenced in time to be completed by **Monday, November 20, 2023**." Docket 51 ¶ 1. LeGrand's argument that Defendants were required to disclose expert witnesses on or before November 20, 2023, misinterprets the Court's Scheduling Order and Amended Scheduling Order. *See* Fed. R. Civ. P. 26(a)(2) (requiring parties to identify expert trial witnesses "at the times . . . the court orders" or 90 days before the trial date in the absence of a court order). Further, LeGrand did not serve any discovery requests seeking the identity of experts. *See* Docket 76 at 7.

LeGrand correctly notes that this Court has denied his motions for appointment of a medical expert. *See* Docket 8 at 10–11; Docket 77 at 4–5. The Court explained that neither 28 U.S.C. § 1915 nor Federal Rule of Evidence 706(a) gives the Court authority to appoint an expert to advocate on behalf of a pro se litigant. Docket 8 at 10–11; Docket 77 at 4–5. But these orders do not prohibit defendants from retaining an expert, at their own cost. LeGrand's motion to strike Dr. Van DeMark's affidavit is denied.

### D.    LeGrand's Eighth Amendment Deliberate Indifference Claims

LeGrand brings Eighth Amendment deliberate indifference to a serious medical need claims against Dr. Carpenter, Dr. Rector, and Dr. Haynes, in their individual capacities. "[D]eliberate indifference to serious medical needs of

prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). But not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). "The plaintiff[] must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784). The plaintiff must show that the defendant's mental state was "akin to criminal recklessness." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012) (quotation omitted). When evaluating whether a defendant displayed deliberate indifference to a plaintiff's serious medical needs, a court considers the defendant's "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position[,] and alternative courses of action that would have been apparent to an official in that position."

44

*Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quoting *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000)).

None of the defendants dispute that LeGrand's Dupuytren's contracture is a serious medical need. Rather, defendants argue that they are entitled to summary judgment because there is no evidence that they deliberately disregarded his medical needs.

### 1. Dr. Carpenter

After he was diagnosed with Dupuytren's Contracture in 2013, LeGrand alleges that Dr. Carpenter "would grant initial treatments and then would deny recommendations by [m]edical experts for continued, follow up, or recommended shots that [s]pecialists from CORE Orthopedics thought [he] would have benefitted from." Docket 1 at 4. According to LeGrand, "[f]or seven years straight, Dr. Carpenter would deny all [m]edical requests for treatment by her own staff and medical team, and all specialists[.]" *Id.* LeGrand contends that his condition caused extreme pain and immobility. *Id.* Because of the alleged denial of treatment for seven years, LeGrand alleges that he has permanent damage to his hands and nerves and experienced extreme pain and suffering. *Id.*

LeGrand's complaint was filed on December 6, 2022. Docket 1. Dr. Carpenter argues that any claims based on her treatment decisions prior to December 6, 2019, are time-barred. Docket 56 at 3–4. Section 1983 does not contain a specific statute of limitations, but the Supreme Court of the United States has instructed courts to apply the most analogous state statute of

limitations to claims made under § 1983. *Wilson v. Garcia*, 471 U.S. 261, 266–68 (1985). South Dakota has a specific statute of limitations governing civil rights actions and requiring such actions to be brought within three years after the alleged constitutional deprivation occurred. SDCL § 15-2-15.2; *see also Bell v. Fowler*, 99 F.3d 262, 266 (8th Cir. 1996). While the length of the limitations period is a matter of state law, "the accrual date of a § 1983 cause of action is a question of federal law that is <u>not</u> resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Under federal law, the general rule is that "accrual occurs when the plaintiff has a complete and present cause of action . . . . [T]hat is, [accrual occurs] when the plaintiff can file suit and obtain relief[.]" *Id.* (cleaned up). In his response to Dr. Carpenter's motion for summary judgment, LeGrand argues that the continuing tort doctrine tolls the commencement of the period of repose. Docket 72 at 19–21. Essentially, according to LeGrand, because he alleges that defendants have continuously refused to treat an incurable disease, his cause of action has not accrued, and the statute has not yet started to run. *Id.*

LeGrand's argument is misplaced, and his allegation against Dr. Carpenter do not allege a continuing tort. LeGrand does not allege a "continuous and unbroken" course of wrongful conduct by Dr. Carpenter causing a single injury. *See Pitt-Hart v. Sanford USD Med. Ctr.*, 878 N.W.2d 406, 415 (S.D. 2016). Instead, he alleges separate, distinct wrongful actions, each of which caused him injury. Notably, each of the alleged wrongful actions were based on Dr. Carpenter's professional medical judgment based on

LeGrand's condition at the time each course of treatment was recommended.
Thus, they must be analyzed individually. For example, LeGrand alleges that
Dr. Carpenter wrongfully denied Dr. McPherson's recommendation for Xiaflex
injections during appointments in August and December 2014. Docket 1-1 at
1, 7. After each of these alleged denials, LeGrand's § 1983 claim accrued, and
he could have filed suit to obtain relief related to the alleged denials. Two years
later, in December 2016, after LeGrand had undergone a surgical procedure
and received a course of Xiaflex injections, Dr. Carpenter denied authorization
for further Xiaflex injections because two different treatment options for his
condition had both failed. Docket 1-1 at 1; Docket 61 ¶ 39. LeGrand's § 1983
claim against Dr. Carpenter arising out of the December 2016 refusal to
authorize Xiaflex injections accrued in December 2016, and he could have filed
suit to obtain relief, but he did not do so. Dr. Carpenter is entitled to summary
judgment on LeGrand's § 1983 claims based on her treatment decisions prior
to December 6, 2019, because those claims are time-barred. *See* SDCL § 15-2-
15.2.

     Dr. Carpenter argues that she is entitled to qualified immunity on
LeGrand's Eighth Amendment deliberate indifference claim. Docket 56 at 6–8.
To determine whether a government official is entitled to qualified immunity,
the court considers (1) whether the facts alleged, viewed in the light most
favorable to plaintiff, demonstrate the official's conduct violated a
constitutional right, and (2) whether the constitutional right was clearly
established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S.

194, 201 (2001). The court may consider the elements in any order, and if either of the elements is not met, then the official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Dr. Carpenter does not dispute that LeGrand's Eighth Amendment right to be free from cruel and unusual punishment includes the right not to have known, objectively serious medical needs disregarded. Docket 56 at 8–9. Dr. Carpenter argues that she is entitled to summary judgment because the undisputed facts do not establish a violation of LeGrand's Eighth Amendment right to be free from cruel and unusual punishment. *Id.* at 9.

Although Dr. Carpenter did not authorize every request for treatment of LeGrand's bilateral Dupuytren's contracture, LeGrand has failed to establish that she was deliberately indifferent to his condition. In September 2021, Dr. Carpenter declined an outside rheumatologist's request for a consult with a hand surgeon because "previous approved treatments have not been successful[.]" Docket 61 ¶ 43. While deliberate indifference may be established when prison medical staff intentionally interfere with a specialist's prescribed treatment or medication, *Estelle*, 429 U.S. at 104–05, "a prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment[,]" *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) (citing *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)). The Court does not find that Dr. Carpenter's professional opinion that a hand surgery consult was not required because previous treatments by a hand

48

surgeon had not been unsuccessful demonstrates a state of mind "akin to criminal recklessness." *McCaster*, 684 F.3d at 746.

In March 2022, LeGrand reported to a provider at the SDSP that his pain was getting worse, and his range of motion was becoming more limited. Docket 61 ¶ 46. The provider increased the dose of LeGrand's pain medication and ordered a physical therapy referral. *Id.* ¶ 47. After evaluating LeGrand, the physical therapist did not think that physical therapy would benefit LeGrand, and LeGrand was scheduled to see Dr. McPherson, a hand surgeon. *Id.* ¶¶ 49, 50. Dr. McPherson discussed treatment options with LeGrand, including conservative measures and surgery. *Id.* ¶ 51. LeGrand wanted to proceed with surgery. Docket 56-8 at 2. But Dr. Carpenter did not authorize surgery because Dr. McPherson had offered bracing and other conservative measures. *Id.* ¶ 55. Dr. Carpenter wanted LeGrand to avail himself of all available conservative treatment before proceeding with another invasive surgery. *Id.* ¶ 56. "Prisoners do not have a constitutional right to any particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). Prison doctors "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Id.* at 765. Dr. Carpenter's refusal to authorize surgery in March 2022 does not constitute deliberate indifference.

A few months later, however, when the orthopedic surgery provider documented that conservative treatment had failed and offered surgery as the only possible treatment option, Dr. Carpenter authorized surgery. *Id.* ¶¶ 84, 85.

49

LeGrand underwent the recommended surgery on his right hand on October 14, 2022, and on his left hand on March 27, 2023. *Id.* ¶¶ 90, 99, 100. Although Dr. Carpenter did not approve surgery as quickly as LeGrand would have liked, when a prisoner seeks to recover for an alleged delay in treatment, the prisoner must place verifying medical evidence in the record to show that there was a detrimental effect caused by the delay. *Jackson v. Riebold*, 815 F.3d 1114, 1119–20 (8th Cir. 2016). If an inmate fails to submit verifying medical evidence that any alleged delay in treatment resulted in an adverse effect, the inmate cannot overcome a motion for summary judgment. *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) ("To avoid summary judgment an inmate alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect." (citation omitted)). Here, LeGrand has not submitted any medical evidence regarding the impact of any alleged delay. Defendants have provided undisputed expert evidence that any delay in performing the recommended surgeries did not cause any adverse or detrimental effect. Docket 60 ¶ 47; *see also* Docket 61 ¶ 106. Because the undisputed facts do not establish that Dr. Carpenter violated LeGrand's Eighth Amendment right to be free from cruel and unusual punishment, she entitled to qualified immunity. Dr. Carpenter's motion for summary judgment on LeGrand's Eighth Amendment deliberate indifference claim is granted.

### 2.    Dr. Rector

LeGrand alleges that after surgery on his left hand on March 27, 2023, he noticed "what seemed to be a sist [sic: cyst] or growth coming out of the index finger[.]" Docket 30 at 11 (capitalization in original omitted). During an encounter with Dr. Rector, according to LeGrand, Dr. Rector "took it upon himself to cut on the surgical incision done by a professional surgieon [sic] without first notifying the surgieon [sic] of this." *Id.* (capitalization in original omitted); *see also* Docket 31 at 24 (alleging that Dr. Rector "by his own 'expert' decision cut on [his] hand, without first consulting the actual surgeon who operated on [him]."). The undisputed record evidence does not support LeGrand's allegations.

Dr. Rector examined LeGrand's left hand on April 5, 2023, and noted "bruising and swelling of proximal digit of 2nd finger." Docket 101-8 at 3; Docket 104 ¶ 177. Although there was some soft tissue bulging through the surgical incision, the "tissue appear[ed] less vascular and protrusive than 2 days ago, and the scab around the edges appear[ed] to be healing well." Docket 101-8 at 3. The "vertical volar sutures from the fasciectomy appear[ed] to be healing well and holding appropriately." *Id.* LeGrand had a follow-up appointment with Dr. McPherson the next week, but he did not want "to wait that long if something needed to be done sooner." *Id.* At LeGrand's request, Dr. Rector called Dr. McPherson's office to discuss next steps. *Id.* LeGrand had presented to Health Services multiple times for evaluation of a small, pink

tissue bulge through the surgical incision on his finger and complained that the small bulge "isn't right and something HAS to be done." Docket 102 ¶ 18.

When Dr. Rector was discussing next steps with Dr. McPherson's office, an orthopedic PA indicated that they might try silver nitrate (chemical cautery) or simple excision of the miniscule extra tissue which could be described as "proud flesh" or granulation tissue. *Id.* ¶ 20. Silver nitrate is a medication that is often used for cauterization to remove granulation tissue and to stop a wound from bleeding or becoming infected. *Id.* Dr. Rector informed LeGrand that he had discussed next steps with Dr. McPherson's office, including using silver nitrate to treat the tissue protruding from the incision site. *Id.* ¶ 21. LeGrand responded that he "absolutely wanted that done[,]" and Dr. Rector proceeded to use a small iris scissors to excise a miniscule amount of granulation tissue from above the skin level. *Id.* ¶ 22. Dr. Rector did not interfere with or disrupt the surgeon's margins in any way. *Id.* ¶ 23. Because the granulation tissue that Dr. Rector excised was vascular, there was a small amount of bleeding, which was not unexpected. *Id.* ¶ 24. Dr. Rector used silver nitrate to stop the bleeding. *Id.* LeGrand told Dr. Rector that he was satisfied with the intervention and informed Dr. Rector that it "looked so much better." *Id.*

LeGrand submitted correspondence, dated April 13, 2023, advising that the culture for his left finger had come back negative. Docket 31 at 10. At the bottom of the correspondence, LeGrand hand wrote that it is "tied to Dr. Rector's un-approved surgery on [his] left hand after surgery by Dr.

McPherson." *Id.* As noted above, there is no competent record evidence that the surgery was "unapproved." Further, there is no evidence that the proud flesh removal resulted in an infection.

During his April 13, 2023, post-surgical appointment with AMG Orthopedics, LeGrand did not express any concern regarding the proud flesh removal Dr. Rector had performed. Docket 101-121. On examination, the surgical incision site appeared to be healing well without any signs of infection. *Id.* There was "[g]ood granulation tissue healing within the open wounds[,] [and] [n]o proud flesh [was] appreciated." *Id.* LeGrand was "doing well," and the plan was to see him again in two weeks to monitor his progress and to check wound healing. *Id.* During LeGrand's next appointment on May 4, 2023, he was "doing well with the open wounds . . . now completely re-epithelialized." Docket 101-122 at 1. These undisputed facts, as a matter of law, are insufficient to support an Eighth Amendment claim for deliberate indifference to a serious medical need.

After the proud flesh removal procedure, LeGrand asserts that Dr. Rector purposefully and intentionally avoided him or abandoned him. Docket 30 at 11. According to LeGrand, Dr. "Rector has been put on notice, [and] has failed to do anything to help [him] thereby showing the culpable state of mind" to cause needless suffering. *Id.* Again, the undisputed record evidence does not support LeGrand's allegations.

During a post-operative appointment on May 4, 2023, Dr. McPherson recommended a trial of Gabapentin. Docket 104 ¶ 13. Because Gabapentin was

no longer formulary, Dr. Rector could not prescribe the medication. *Id.* ¶ 58. A "non-form" request had to be approved by Dr. Haynes, the Chief Medical Officer. *Id.* Initially, Dr. Haynes denied the "non-form" request for Gabapentin. Docket 104 ¶ 21. But after LeGrand expressed to Dr. Rector frustration that Health Services was not following Dr. McPherson recommendation for a postoperative trial of Gabapentin, Dr. Rector reviewed LeGrand's chart, located a reference to Gabapentin for thirty days after surgery, and submitted a request for thirty days of Gabapentin to "quell post-surgical 'nerve' pain[,]" which was approved. Docket 101-32 at 2–4; Docket 101-33 at 1; Docket 104 ¶ 200.

After Dr. McPherson "strongly recommend[ed]" in November 2023, that LeGrand be maintained on Gabapentin, Dr. Rector notified Dr. Haynes of the recommendation and requested approval. Docket 101-84 at 1; Docket 104 ¶ 215. Dr. Haynes denied the non-formulary request. Docket 101-84 at 1. At LeGrand's request, Dr. Rector contacted Dr. McPherson regarding his recommendation for Gabapentin. Docket 101-91 at 2; Docket 101-94 at 1; Docket 104 ¶ 127. Dr Rector then submitted another non-formulary request for Gabapentin and shared Dr. McPherson's reasoning with Dr. Haynes. Docket 101-91 at 2; Docket 101-94 at 1; Docket 104 ¶¶ 127, 131, 218. At LeGrand's request, Dr. Rector submitted at least two other "non-form" requests for Gabapentin. Docket 101-64 at 3; Docket 101-110; Docket 104 ¶¶ 94, 152, 210, 223.

It is undisputed that Dr. Rector saw LeGrand numerous times for pain complaints, and while Dr. Rector was not authorized to prescribe Gabapentin, Dr. Rector did not fail to do anything as LeGrand alleges. When LeGrand's requests for Gabapentin were not approved, Dr. Rector offered alternatives to manage LeGrand's pain, including duloxetine, Voltaren gel, Vitamin E cream to help soften scar tissue, an occupational therapy referral, acetaminophen, an orthopedic follow-up for sensitive, painful areas of scar tissue, hand compression gloves, a TENS unit, and Xiaflex injections. Docket 101-21; Docket 101-51 at 4; Docket 101-61; Docket 101-64; Docket 101-84; Docket 101-88; Docket 101-98 at 2; Docket 104 ¶¶ 28, 77, 87, 91, 93, 125, 136, 199, 201, 202, 204, 205, 210, 211, 217, 220. Dr. Rector put in a referral for nerve conduction study to "help clarify the degree of nerve pain." Docket 101-32. LeGrand refused most of the other options Dr. Rector had offered to alleviate his symptoms. Docket 101-48 at 1.

Along with his amended and supplemental complaint, LeGrand submitted documents, including an Informal Resolution Request (IRR) dated July 10, 2023, against "Dr. Mark Rector for negligence and abandonment." Docket 31 at 24 (capitalization in original omitted). In the IRR,[6] LeGrand contends that he was seen in Health Services on June 18 and June 24 for titration of his Gabapentin. *Id.* A few days earlier, LeGrand had submitted a kite "begging" to see Dr. Rector for pain. Docket 101-42. In his kite, LeGrand

---

[6] The IRR is not signed under penalty of perjury. Thus, it is simply an unsworn allegation insufficient to overcome the undisputed record evidence defendants have cited in support of their motions for summary judgment.

noted that he had had visits to sick call on June 18 and June 24 for hand pain and requesting an appointment with Dr. Rector. *Id.* According to LeGrand, he assumed that Dr. Rector refused to see him or was completely unaware of his needs. *Id.* The is no mention in either the June 18 or June 24 sick call encounters of titration of Gabapentin. Docket 101-38; Docket 101-40. After the June 18 encounter, the nursing staff requested a provider chart review, *see* Docket 101-38 at 4, but Dr. Rector is not the provider who performed the chart review, *see* Docket 101-39. Following the June 24 encounter, the nursing staff determined that no provider referral or chart review was necessary. Docket 101-40 at 4–5. Thus, there is no evidence to support LeGrand's allegation that Dr. Rector refused to see him or abandoned him. Dr. Rector, on the basis of the undisputed record evidence, is entitled to summary judgment on LeGrand's Eighth Amendment deliberate indifference claim.

### 3.    Dr. Haynes

LeGrand alleges that Dr. Haynes ceased his surgeon's orders for Gabapentin. Docket 30 ¶ 20. He also alleges that Dr. Haynes falsely informed him that Gabapentin is "non-formulation within the facility[.]" *Id.* LeGrand has not submitted any competent evidence to support his assertion that Gabapentin was not, in fact, non-formulary when Dr. Haynes denied the non-form requests that were submitted.[7] Notably, Dr. Haynes, based on the record

---

[7] LeGrand's allegation is difficult to reconcile with the statements he made to providers. For example, LeGrand told nursing staff that he "understands that the prison is moving away from" Gabapentin. Docket 101-19 at 1. He advised Dr. McPherson that Gabapentin had been quite helpful for him but had not been able to get it because it is not a formulary item. Docket 101-123 at 1.

evidence, is not the only provider who informed LeGrand that Gabapentin was non-formulary. *See* Docket 101-18. Further, it is undisputed that Dr. Rector was not authorized to prescribe Gabapentin after LeGrand's last surgery because it was no longer formulary. Docket 102 ¶ 43; *see also* Docket 101-91 at 2 (stating that "[n]ow here at JPA [Jameson Prison Annex], gabapentin IS considered a substance of abuse"); Docket 101-94 at 1 (stating that "Gabapentin is in fact addictive and is a primary drug of abuse in prisons"). Thus, instead of prescribing Gabapentin, Dr. Rector submitted multiple non-form requests seeking approval from Dr. Haynes. Docket 101-84; Docket 104 ¶¶ 200, 210, 215, 218, 223. In his "Statement of Disputed Facts," LeGrand asserts that Gabapentin is non-formulary only for him and alleges that there are multiple inmates who are taking Gabapentin. Docket 109 at 3. But LeGrand does not provide any evidence to support these allegations. *Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2007) ("[S]keletal allegations, unsupported with specific facts or evidence, are insufficient to create a genuine issue of fact so as to preclude granting summary judgment.").

After LeGrand's surgery in March 2023, Dr. McPherson recommended a trial of Gabapentin. Docket 104 ¶ 13. Initially, Dr. Haynes elected not to follow Dr. McPherson's recommendation and did not approve the "non-form" request for Gabapentin. Docket 104 ¶ 21. Dr. Haynes's decision was based, in part, on Dr. McPherson's medical record noting that the burning sensation was limited to the "small finger" and was "likely from the dissection around the digital nerves." *Id.* (quoting Docket 103 ¶ 16). In Dr. Haynes's opinion, the "very

limited area of neuropathic pain" would be best managed by topical agents if
Cymbalta was ineffective. *Id.* ¶ 22 (quoting Docket 103 ¶ 17). LeGrand was
prescribed Cymbalta and Voltaren gel to manage his pain. *Id.* ¶¶ 28, 30. On
May 30, 2023, LeGrand reported to Dr. Rector that he was experiencing pain in
both hands and had been compliant with all the pain modalities he had been
prescribed. Docket 101-32 at 2. At LeGrand's request, Dr. Rector submitted a
request for "30 days of Gabapentin to quell post-surgical 'nerve' pain," which
Dr. Haynes approved, noting that it was non-renewable and that they would
"await emg/nct results[.]". *Id.* at 4; Docket 101-33 at 1.

Dr. Haynes did not approve any other non-form requests for Gabapentin.
After reviewing the most recent record from LeGrand's orthopedic surgeon, Dr.
Haynes denied a request on July 5, 2023, because of "abuse potential" and
directed the medical staff to consider other options for LeGrand's small finger
discomfort. Docket 101-43 at 1. LeGrand met with Dr. Rector on August 29,
2023, to review the results of a nerve conduction study. Docket 101-62 at 2;
Docket 104 ¶¶ 88, 208. Dr. Rector explained that the "findings are not
consistent with global hand neuropathy or radicular type of pain[]" because the
EMG demonstrated localized abnormalities on one finger of each hand. Docket
101-62 at 2–3; Docket 104 ¶¶ 88, 208. Although LeGrand voiced
"understanding that the findings are slight and do not match his stated
bilateral hand pattern of pain[,]" he still requested Gabapentin, reporting that it
had previously helped alleviate his pain. Docket 101-62 at 3; Docket 104
¶¶ 89, 209. Dr. Rector submitted another non-formulary drug request for

Gabapentin. Docket 101-64 at 3; Docket 104 ¶¶ 94, 210. Dr. Haynes did not approve the request for Gabapentin. Docket 101-64; Doket 104 ¶ 95. When Dr. Haynes reviewed LeGrand's medical records, he noted that LeGrand has a history of Gabapentin misuse. Docket 103 ¶ 92; Docket 104 ¶ 95. Because the nerve conduction study had indicated that the neuropathy was localized to two fingers, in Dr. Haynes's opinion, the risks of Gabapentin outweighed the benefits. Docket 101-64 at 1; Docket 104 ¶¶ 95. 96. Dr. Haynes instructed Dr. Rector to consider "other components of multimodal pain management." Docket 101-64 at 1.

When LeGrand saw Dr. McPherson in November 2023, LeGrand reported itching and burning pain along his scars. Docket 101-123 at 1. LeGrand told Dr. McPherson that Gabapentin had been "quite helpful" but it is not a formulary item so he sometimes has not been able to get it. *Id.*; Docket 104 ¶ 115. Dr. McPherson concluded that LeGrand would be a candidate to proceed with Xiaflex injections for recurrent Dupuytren's in his right middle finger and small left finger. Docket 101-123 at 1; Docket 104 ¶ 118. Dr. McPherson recommended hydrocortisone cream along the scar area and continued used of compression-type garments as needed for comfort and support. Docket 101-123 at 1; Docket 104 ¶ 118. Dr. McPherson also "strongly recommend[ed] that he be maintained on gabapentin 300 mg 3 times daily likely on a chronic basis." Docket 101-123 at 1; Docket 104 ¶ 119.

Dr. Rector requested approval of Dr. McPherson's recommendations, including Gabapentin. Docket 101-84 at 1; Docket 101-86; Docket 101-87;

Docket 104 ¶¶ 215, 216. Dr. Haynes approved Xiaflex injections, but did not approve Gabapentin. Docket 101-84 at 1; Docket 101-87; Docket 104 ¶ 124. When rejecting the non-formulary request for Gabapentin, Dr. Haynes documented that the nerve conduction study demonstrated "2 finger neuropathy.[.]" Docket 101-84 at 1; Docket 104 ¶ 121.

Shortly thereafter, at LeGrand's "firm request[,]" Dr. Rector resubmitted a non-formulary drug request for Gabapentin and informed Dr. Haynes that, in Dr. McPherson's opinion, Gabapentin is non-addictive. Docket 101-91 at 2; Docket 101-94 at 1; Docket 104 ¶¶ 127, 131, 218. But Dr. Rector also noted that at JPA [Jameson Prison Annex] Gabapentin is considered a substance of abuse, so he was not sure that the request would be approved. Docket 101-91 at 2; Docket 104 ¶¶ 128, 218. On November 27, 2023, Dr. Haynes rejected the non-formulary request for Gabapentin, noting "2 digit neuropathy without evidence of proximal neuropathy present. Gabapentin is in fact addictive and is a primary drug of abuse in prisons . . . . Patient is noncompliant with other therapies that would help his pain." Docket 101-94 at 1; Docket 104 ¶ 130.

During a routine physical examination on January 23, 2024, LeGrand reported that he did not feel that his pain had been adequately treated and again requested Gabapentin. Docket 101-19; Docket 104 ¶¶ 149, 221. At LeGrand's request, Dr. Rector submitted another non-formulary drug request for Gabapentin. Docket 101-110; Docket 104 ¶¶ 152, 223. Dr. Haynes denied the request, noting that "NCT [nerve conduction test] results are mild and not consistent with the patient's pain." Docket 101-110 at 1; Docket 104 ¶ 153.

In short, after approving a thirty-day trial of Gabapentin to quell post-operative nerve pain, Dr. Haynes declined to continue prescribing Gabapentin because continued use of Gabapentin, in his medical judgment, was not in LeGrand's best interest. Docket 103 ¶ 162. One of the goals of LeGrand's treatment plan was to reduce his dependency on habit-forming medications and provide him with effective medication less susceptible to abuse because he had a documented history of Gabapentin abuse. *Id.* ¶ 163.

It is well established that LeGrand does not have a constitutional right to any particular type of treatment, including a specific pain medication. *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996); *Harris v. Gusman*, 2019 WL 6770021, at *4 (E.D. La. Dec. 12, 2019) ("a prisoner has no constitutional right to be prescribed a particular pain medication, and the mere fact that he disagrees as to which pain medication is appropriate simply is not actionable under § 1983"); *Swafford v. Tiggs-Brown*, 2018 WL 7395164, at *8 (C.D. Cal. Oct. 22, 2018), *report & recommendation adopted by* 2019 WL 914123 (C.D. Cal. Feb. 22, 2019) ("Abundant case law explains that an Eighth Amendment deliberate indifference claim cannot be based upon a disagreement over the type and dosage of medication prescribed, and that an inmate is not entitled to his or her medication of choice."). Although Dr. McPherson recommended continued use of Gabapentin, prison medical providers do not violate the Eighth Amendment if, in the exercise of their professional judgment, they decide that another course of treatment is more appropriate. *Dulaney*, 132 F.3d at 1239 ("[P]rison doctors remain free to exercise independent medical judgment.");

61

*Hughbanks v. Fluke*, 4:21-CV-04167-KES, 2024 WL 1329799, at *17 (D.S.D.
Mar. 28, 2024) (stating an inmate does not have a constitutional right to
receive the specific pain medication suggested by an outside provider); *Hensley
v. Montgomery Cnty.*, 2006 WL 156733, at *5 (E.D. Mo. Jan. 20, 2006) ("E]ven
when a prison physician has failed to follow the recommendations of outside
specialists, the prison doctor will not be displaying deliberate indifference if the
doctor used [his] professional judgment when choosing the particular course of
treatment."). Here, each time Dr. Haynes declined to approve a non-formulary
request for Gabapentin, he documented why, in his professional judgment,
Gabapentin was not an appropriate pain medication. Further, it is undisputed
that LeGrand was provided many other treatment options. Docket 101-21;
Docket 101-51 at 4; Docket 101-61; Docket 101-64; Docket 101-84; Docket
101-88; Docket 101-98 at 2; Docket 104 ¶¶ 28, 77, 87, 91, 93, 125, 136, 199,
201, 202, 204, 205, 210, 211, 217, 220. LeGrand's disagreement with the
management of his pain complaints is insufficient to establish deliberate
indifference. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("[M]ere
disagreement with treatment decisions does not rise to the level of a
constitutional violation." (internal quotation omitted)); *Steele v. Weber*, 278 F
App'x 699, 700 (8th Cir. 2008) (per curiam) (affirming grant of summary
judgment against plaintiff when prison staff refused to continue prescribing
high-dose narcotic pain medication he was prescribed before incarceration
because prison doctors believed that the pre-incarceration level of medication
was harmful for plaintiff and was a mere disagreement with treatment).

62

Accordingly, Dr. Haynes is entitled to summary judgment on LeGrand's deliberate indifference claim.

### E.    LeGrand's Clams Against Former Warden Sullivan

Dan Sullivan was employed by the SDDOC and served as Warden of the SDSP. Docket 59 ¶¶ 1, 3. LeGrand alleges that "Warden Sullivan, would deny all grievances submitted in this matter creating [him] to continue to complain to the very medical team denying all [his] treatment requests." Docket 1 at 4. As a result, LeGrand asserts that he "was kept in pain constantly and [his] daily living was severely limited." *Id.* But LeGrand has only provided evidence that former Warden Sulliven signed a single Administrative Remedy Response on July 20, 2022. Docket 61 ¶ 121. LeGrand attached this response to his complaint. Docket 1-1 at 46–47. LeGrand had requested pain management and surgery on both of his hands in a Request for Administrative Remedy dated June 24, 2022. *Id.* Former Warden Sullivan consulted with the prison medical staff regarding LeGrand's request for surgery. Docket 61 ¶ 125. Because he has no medical training or experience, former Warden Sullivan relied on the medical staff regarding the medical treatment to be provided for LeGrand's Dupuytren's contractures. *Id.* ¶¶ 125, 126. After consulting with the medical staff, former Warden Sullivan responded that "you currently have a doctor's order for Gabapentin for pain management. You have a scheduled appointment with rheumatology and orthopedics. Your upcoming appointments will determine if surgery is necessary." Docket 1-1 at 46–47. The record does not reveal that former Warden Sullivan responded to any other grievances or

Requests for Administrative Remedy submitted by LeGrand or had any other involvement in any of the matters outlined in LeGrand's complaint. Docket 61 ¶ 121.

"A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions." *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) (citing *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). When it is undisputed that a prison warden lacks medical expertise and relies on the prison medical staff's medical judgment and diagnostic decisions when responding to an inmate's grievance, there is no genuine issue of material fact that the warden was personally involved in any alleged unconstitutional denial of medical care, and the warden is entitled to summary judgment. *Daulton v. Dooley*, 4:05-CV-4121-LLP, 2006 WL 1084118, at *2 (D.S.D. Apr. 21, 2006); *see also Dubois v. Dooley*, 277 F. App'x 651, 652 (8th Cir. 2008) (per curiam) (affirming summary judgment in favor of warden when his only involvement was to respond to grievances by relying on the medical judgment of the prison medical staff). On the basis of the undisputed facts, former Warden Sullivan is entitled to summary judgment on LeGrand's Eighth Amendment claim for deliberate indifference to a serious medical need.

### F.    LeGrand's Claims for Injunctive Relief

LeGrand requests "[i]njunctions placed on . . . the Defendants to give [him] all treatments, surgeries, and any other medical treatments required and suggested by [his] specialist[,] without any improper delays." Docket 1 at 7. He

also seeks a "system-wide injunction to revise Defendants' policies, procedures, and practices to monitor and implement titration of both reduced and increased medications, to create[] formulated medications specifically for chronic care, and surgical pain(s) such a Gabpiten's [sic], Tramadols [sic] and other like medications. To put in place a weekly or bi-weekly follow ups with outside specialists and other professional doctors regarding Dupuytren's Contractures." Docket 30 ¶ 56 (capitalization in original omitted). Wasko, Dr. Haynes, Dr. Rector, and Amber Pirraglia move for summary judgment on LeGrand's official capacity claims for injunctive relief. Docket 56 at 39–42; Docket 101 at 51–53.

LeGrand contends that the Court should deny summary judgment and grant his requests for injunctive relief against Pirraglia, Wasko, and Haynes[8] because they did not submit affidavits in support of their summary judgment motion. *See* Docket 72 at 23–24; Docket 110 at 2. LeGrand's argument is not well founded. The Supreme Court of the United States has instructed that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp.*, 477 U.S. at 323.

Amber Pirraglia is the acting Warden at the SDSP, Docket 125 at 1–2, and Dr. Rector is a provider at the SDSP, Docket 102 ¶ 3. But LeGrand is no longer incarcerated at the SDSP. He has been transferred to the Mike Durfee

---

[8] Dr. Haynes submitted an affidavit in support of his motion for summary judgment on LeGrand's Eighth Amendment deliberate indifference claim against him in his individual capacity. *See generally* Docket 103.

State Prison in Springfield. Docket 126. Thus, LeGrand's claims for injunctive relief against Acting Warden Pirraglia and Dr. Rector are moot. "[A] prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (citing *Wycoff v. Brewer*, 572 F.2d 1260, 1262 (8th Cir. 1978)); *see also Beaulieu v. Ludeman*, 690 F.3d 1017, 1024 (8th Cir. 2012) (holding that prisoners' claims for injunctive relief were moot because they were transferred out of the jail that allegedly violated their constitutional rights); *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012) (holding that plaintiff's request for injunctive relief concerning the facility's policies or practices is moot because he is no longer housed at the facility). Acting Warden Pirraglia and Dr. Rector are entitled to summary judgment on LeGrand's claim for injunctive relief, and the official capacity claims against them are dismissed.

Because LeGrand remains in the custody of the SDDOC, his claims for injunctive relief against Wasko and Dr. Haynes are not moot, but Wasko and Dr. Haynes are entitled to summary judgment on LeGrand's official capacity claim for injunctive relief because LeGrand's Eighth Amendment rights were not violated. *Falls v. Nesbitt*, 966 F.2d 375, 380 (8th Cir. 1992) ("We have no Constitutional violation; therefore, the use of an injunction is unnecessary since the conduct sought to be enjoined no longer represents a claim which violates the Eighth Amendment.").

After the defendants' motions for summary judgment were fully briefed, LeGrand filed a motion for preliminary injunction requesting that the Court

66

order defendants to "re-instate proven effective medications of 600 mg Gabapentin 3x a day and to be given Xiaflex shots as needed." Docket 127 at 5 (capitalization in original omitted). The preliminary injunctive relief LeGrand seeks is essentially the same injunctive relief he seeks in his complaint (Docket 1 at 7) and amended complaint (Docket 30 ¶ 56). The Court has determined that defendants are entitled to summary judgment on LeGrand's deliberate indifference to serious medical needs claims. Thus, LeGrand's motion for preliminary injunction, Docket 127, is denied because LeGrand has not established that his constitutional rights have been violated.

### G.    LeGrand's state-law medical malpractice claims against Dr. Carpenter, Dr. Haynes, and Dr. Rector

LeGrand alleges that Dr. Carpenter, Dr. Haynes, and Dr. Rector are liable for state-law medical malpractice. Docket 1 at 6; Docket 8 at 13; Docket 30 at 18–18; Docket 77 at 14–15, 23. Because there is not complete diversity of citizenship, *see* Docket 1 at 2; Docket 30 at 9–11, there is no federal subject matter jurisdiction over LeGrand's state-law claims unless this Court exercises supplemental jurisdiction under 28 U.S.C. § 1367(a). Section 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]" But § 1367(c)(3) permits a district court to decline to exercise supplemental jurisdiction over state-law claims if the court "has dismissed all claims over which it has original jurisdiction[.]" *See also Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010). "The

district court is afforded broad discretion in determining whether to exercise supplemental jurisdiction." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) (citation omitted). The Eighth Circuit Court of Appeals has instructed that district courts should "exercise judicial restraint and avoid state law issues wherever possible." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). Here, Dr. Carpenter, Dr. Haynes, and Dr. Rector argue that LeGrand's state-law medical malpractice claims are barred by his failure to comply with notice provisions of SDCL § 3-21-2. Docket 56 at 33–34; Docket 101 at 48–50. It is more appropriate for a South Dakota state court to consider whether South Dakota's statutory notice requirements bar LeGrand's state-law malpractice claims. Because this Court has dismissed LeGrand's § 1983 claims, the only claims within this Court's original jurisdiction, the Court declines to exercise supplemental jurisdiction over LeGrand's state-law malpractice claims.[9] *See Gibson v. Weber*, 431 F.3d 339, 342 (8th Cir. 2005) (holding that the district court did not err by declining to exercise supplemental jurisdiction over inmates' state-law medical malpractice claims after granting summary judgment in favor of defendants on inmates' § 1983 claims); *Mountain Home Flight Serv., Inc. v. Baxter Cnty.*, 758 F.3d 1038, 1045 (8th Cir. 2014) (holding that district court acted within its discretion by declining to exercise supplemental jurisdiction after dismissing § 1983 claims). LeGrand's

---

[9] In their briefs in support of their motions for summary judgment, Dr. Carpenter, Dr. Haynes, and Dr. Rector urge the court to decline to exercise supplemental jurisdiction on LeGrand's state-law medical malpractice claims. Docket 56 at 31–33; Docket 101 at 46–48.

state-law medical malpractice claims against Dr. Carpenter, Dr. Haynes, and Dr. Rector are dismissed without prejudice, and their motions for summary judgment on LeGrand's state-law medical malpractice claims are denied without prejudice as moot.[10]

## II.    Defendants' Motion Strike

After Dr. Haynes, Dr. Rector, and Kellie Wasko submitted a reply brief in support of their motion for summary judgment (Docket 114), LeGrand moved for an extension of time to file a "Response Brief to Defendants' Reply Brief to Plaintiffs' [sic] Objections to Defendants' Amended Motion for Summary Judgment." Docket 115. Defendants opposed LeGrand's motion as the applicable rules of procedure do not permit LeGrand to file an additional responsive brief. Docket 116. The District of South Dakota's local rules do not contemplate surreply briefs in opposition to a motion as a matter of right. D.S.D Civ. LR 7.1.B. Because LeGrand's motion for extension of time did not identify any new information or arguments in defendants' reply brief that might be a basis for granting leave to file a surreply, the Court denied LeGrand's motion for extension of time. Docket 117 at 2. Although the Court specifically informed LeGrand that he could not file a response to defendants' reply brief, LeGrand filed a responsive brief, which appears to be a surreply. Docket 118. Defendants move to strike, or in the alternative, to disregard LeGrand's

---

[10] Because the Court declines to exercise supplemental jurisdiction over the state law medical-malpractice claims, it is not necessary for the Court to consider LeGrand's objections to the affidavit of Craig Ambach, *see* Docket 72 at 13–18, because that affidavit (Docket 57) relates to only the state-law medical malpractice claims.

"Response Brief to Defendants' Reply Brief to Plaintiff's Objections to Defendants' Amended Motion for Summary Judgment; with Plaintiff's Notice of Objections to Defendants' Reply Brief of July 31, 2024." Docket 120. LeGrand's surreply repeats many of the arguments he has raised in his other filings, some of which this Court has rejected. But the response does not contain any impertinent or scandalous matter. Thus, it is more appropriate to disregard rather than to strike Docket 118, LeGrand's "Response Brief to Defendants' Reply Brief to Plaintiff's Objections to Defendants' Amended Motion for Summary Judgment; with Plaintiff's Notice of Objections to Defendants' Reply Brief of July 31, 2024." *See* Docket 118. Defendants' motion to strike, Docket 120, is denied, but the alternative motion to disregard, Docket 120, is granted.

### III.   **LeGrand's Motion for Judgment on the Pleadings and to Set a Trial Date**

Throughout this case, LeGrand has filed various "objections" to defendants' pleading and this Court's orders. For example, he objected to Dr. Carpenter's, Dr. Haynes's, and former Warden Sullivan's answers. *See* Dockets 36, 37, and 46. He objected to this Court's February 12, 2024 order on various motions he had filed, *see* Docket 88; the Court's January 23, 2025 order denying his discovery motions, motion for an ADA typist, and motion to disqualify defendants' counsel, *see* Docket 135; and the Court's February 6, 2025 order denying his request for copies, *see* Docket 139. At times, LeGrand captions his responses to defendants' motions and his replies to defendants' responses to his motions as "objections." *See* Dockets 40, 53, 72, 108, 121,

70

133. LeGrand's request that this Court issue an order separately addressing each of his "objections" is denied.

Neither the Federal Rules of Civil Procedure nor the District of South Dakota's Civil Local Rules of Practice provide for "objections." Federal Rule of Civil Procedure 7(b)(1) requires that a request for court order be made by motion, state with particularity the grounds for seeking the order, and state with particularity the relief sought. LeGrand's "objections" do not comply with Rule 7(b)(1). Nevertheless, as this order demonstrates, the Court has considered all LeGrand's arguments in support of his motions and in opposition to defendants' motions regardless of how he captioned his submissions. While Federal Rules of Civil Procedure do not permit replies to answers unless ordered by Court, *see* Fed. R. Civ. P. 7(a), the Court considered LeGrand's arguments in his objection to Dr. Carpenter's, Dr. Haynes', and Dr. Rector's answers when ruling on LeGrand's motion for default judgment against Dr. Carpenter and his motion to disqualify defendants' counsel. *See* Dockets 77 at 5–6; Docket 132 at 10–12. Finally, LeGrand's objections to this Court's orders, *see* Dockets 88, 135, 139, simply repeat the arguments LeGrand raised in support of his motions. Even when liberally construed, none of LeGrand's objections present any colorable argument that might be a basis for relief under Rule 60(b).

## IV.    **LeGrand's Motion for a Rule 35 Examination**

LeGrand moves for a Rule 35 examination. Docket 144. The motion is dated November 20, 2023, but it was not received and docketed until February

21, 2025. The motion is now moot, but even if it had been received and docketed shortly after November 20, 2023, the motion would have been denied. Federal Rule of Civil Procedure 35(a)(1) provides that "[t]he court where an action is pending may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." But LeGrand cannot request a court-ordered examination on himself. "[A] party may not use the rule to obtain appointment of an expert to perform a medical examination on him; the rule only authorizes the court to order an examination at the behest of another party." 8B Charles A. Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2232 (3d ed. 2010). Because Rule 35 does not permit a party to seek his own medical examination, a prisoner alleging an Eighth Amendment violation cannot use Rule 35 as a mechanism to obtain a second medical opinion because the prisoner disagrees with the course of treatment provided by prison medical personnel. *Gannaway v. Prime Care Med., Inc.*, 150 F. Supp. 3d 511, 523 n.4 (E.D. Pa. 2015), *aff'd*, 652 F. App'x 91 (3d Cir. 2016). For these reasons, LeGrand's motion for a rule 35 examination, Docket 144, is denied.

## CONCLUSION

For these reasons, IT IS ORDERED:

1.  That LeGrand's motion to strike the Affidavit of Robert Van Demark, Jr., M.D. (Docket 72 at 9–13) is denied.

2.  That defendants' motions for summary judgment (Dockets 55, 100) on LeGrand's § 1983 claims are granted. The Court declines to

exercise supplemental jurisdiction over LeGrand's state-law medical practice claims against Dr. Carpenter, Dr. Haynes, and Dr. Rector. LeGrand's state-law medical practice claims against Dr. Carpenter, Dr. Haynes, and Dr. Rector are dismissed without prejudice, and their motions for summary judgment (Dockets 55, 100) on the state-law medical malpractice claims are denied without prejudice.

3.    That defendants' motion to strike (Docket 120) is denied, but the alternative motion to disregard (Docket 120) is granted.

4.    That LeGrand's motion for an evidentiary hearing (Docket 123) is denied as moot.

5.    That LeGrand's motion for preliminary injunction (Docket 127) is denied.

6.    That LeGrand's motion for judgment on the pleadings (Docket 138) is denied, and his motion to set a trial date (Docket 138) is denied as moot.

7.    That LeGrand's motion for a Rule 35 examination (Docket 144) is denied.

Dated March 6, 2025.

BY THE COURT:

/s/ *Camela C. Theeler*

CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE